## Gonzales v. Tucker.

### Opinion delivered January 8, 1912.

Cancellation of instrument—mistake.—Where all the facts and circumstances show that, in conveying all of his property to his daughter, the grantor thought he was executing a will, the deed will be cancelled.

Appeal from Sebastian Chancery Court, Fort Smith District; *J. V. Bourland,* Chancellor; reversed.

*Edwin Hiner,* for appellant.

Viewing the testimony in the light of the circumstances surrounding the transaction, it is apparent that appellant never intended to execute a deed to the property; that he was induced to sign the deed under the belief that he was signing a will; that his signature was obtained through fraud and misrepresentation and that said deed is without consideration. 33 Ark. 425; 26 Ark. 604.

No brief filed for appellee.

Hart, J. On the 13th day of April, 1911, Paul Gonzales instituted this action in the chancery court against Augusta Tucker, to cancel the quitclaim deed executed and delivered by him to her on the 3d day of September, 1910, on the ground that

the execution of the deed was obtained by fraud and undue influence and was without consideration.

The defendant denied all the material allegations of the complaint.

According to the plaintiff's own testimony, he is 59 years old, and came to this country from Mexico about fourteen years ago. He speaks English brokenly, but does not understand the language well. The defendant is his daughter, and is 17 years of age. When she was six months, the plaintiff separated from her mother, and did not see his daughter any more until she was eleven years of age, at which time she was living with her mother. He did not then see her any more until a short time before the deed in question was executed. In the meantime he had remarried, and had come into possession of the property in question by virtue of a will made in his favor by this second wife. Some time before the deed in question was executed, his daughter came to Fort Smith, where he lived and instituted a suit against him for maintenance. The suit was dismissed by his daughter, and she then came to live with him, and, thinking he was executing a will in her favor, he executed the deed in controversy. After the deed was executed, he continued to hold possession of the property and his daughter lived with him for a short time. As soon as he found out that his daughter claimed the property under the deed, he denied that he had executed a deed to her, but maintained that the paper that he had signed was only intended to be a will. Shortly afterwards, as above stated, he brought this suit to cancel the deed.

Omar Willett testified: "I have known Paul Gonzales about eighteen or twenty years. He is a Mexican, and does not understand the English language very well. Of course if you repeat it to him time after time, you can get him to understand it. I have worked with him, and in giving him orders you have to go and tell him what to do. He lacks understanding in ordinary business affairs, and this is due chiefly to the fact that he does not readily understand what is said to him. I think the house and lots in controversy are worth about $1,200 or $1,500."

Ezra J. Morgan, a lawyer and justice of the peace, testified: "I have known Paul Gonzales between nine and ten

years. He is a Mexican. He does not speak the English language so that he can be readily understood, and his knowledge of the English language is limited. There are a good many words that he does not understand, and his vocabulary is limited. He is a carpenter. In my dealings with him and in our business transactions, I found it very difficult to make him understand exactly what I meant. Frequently I could not make him understand what I wanted him to do, and I got my brother, who understands the Spanish language, to interpret for me. I know his daughter, the defendant. She is a quick, apt girl. The hearing of the plaintiff is very defective, and his understanding is poor."

Hallie McManus testified: "I am a public stenographer, and have known Paul Gonzales about three years. I have had some business dealings with him. It is difficult for him to understand the English language, and I am never sure whether he understands what I am explaining to him."

Augusta Tucker, the defendant, testified: "I am the daughter of the plaintiff and am seventeen years of age. After my father and mother separated, I never lived with my father until I went to live with him about the time the deed in question was executed. I instituted a suit for maintenance against my father. J. D. Lighter was my attorney, and Edwin Hiner was my father's attorney. My father said that he wanted me to have the property in question, and I told him 'no' that he would want to take it away from me. He said no he wanted to give me a deed to it, and wanted my attorney to prepare the deed. I went to live with my father, and he promised to support me. On the 3d of September, 1910, the deed in question was executed by my father at Mr. Lighter's office. The deed was explained to my father, and he understood that he was making me a deed, and that he was not executing a will in my favor. I lived with my father for a few weeks. He did not have any money or food, and my stepsister and her husband brought food and coffee out there for us. I dismissed my suit for maintenance, and soon after this my father wanted me to move away and live with my sister. I did so, and shortly afterwards, in December, married."

Mrs. Ollie Speaker, a stepdaughter to the plaintiff, and her husband testified that they heard the plaintiff say that he

wished to deed the property in question to his daughter; that the property was willed to him by his second wife, and that she, thinking that he had not treated his first wife, the mother of the defendant, and their daughter properly, expressed a wish that he would give the property to his daughter. Mr. Speaker said that the plaintiff made the remark "that he wanted to deed the property to Augusta, that she was the heir."

Mrs. Emma Lighter testified: "I was in the office when the deed in question was executed. The plaintiff said: 'I have not done right by Augusta, and she is all I have got. I am going to live for her from now on, and I am going to look out for Augusta; but myself, I don't care whether I have anything or not. Paul will get along some way.'" Upon being asked whether she had any difficulty in understanding what he said, she said: "Well, sometimes I would have to ask him what he said, and sometimes I would have to repeat what I said to him. I was present when this same deed was made." Deed was read and explained to him. It was read to Gonzales and his daughter, and she said: 'Papa, do you understand it?' She would tell him the words in the deed and the contents of the deed. "The word 'deed' was used, I am sure it was; never heard anything said about a will; was there when he handed her the deed, and Gonzales said: 'You see she has got the deed.'"

She further said in reference to the execution of the deed that Mr. Lighter would explain, and then his daughter would explain it to the plaintiff. His daughter would ask the plaintiff sometimes two or three times if he understood it, and the plaintiff would answer, "Yes." She said that the reason his daughter did this was just to see if her father understood it.

J. D. Lighter testified: "The deed was prepared by me and executed in my office. The plaintiff told me that he wished to deed to her four lots. There was a mortgage on two of the lots, and I suggested to him that she could never pay that mortgage off, so it was decided that these two lots should be left out of the deed, and the deed was executed to the two lots in controversy. The consideration in the deed was $1.00 and love and affection for his daughter. I asked him if he loved his daughter, and he said that he did. He said that his wife, who had willed him the property, said that she loved Augusta

and wanted her to have the lots.   He further stated that he had treated Augusta wrong, and wanted to make her a deed to the lots.   His daughter explained the matter to him.   When the deed had been executed, he put it in an envelope and handed it to Augusta, saying, 'Here, baby, take this;   this is yours. When we go to housekeeping, when I am old, I know we will have a home.'   He was almost crying."

On cross examination, he said:   "Q.   Why did you have the daughter to explain to him?

"A.   I didn't have it explained to him.   .When they are together talking, she always talks back.

"Q.   Do you mean that she interpreted?

"A.   Well, it seems that she is always particular to see that he understands when anybody is talking.   He using broken English."

After the deed was executed, the defendant paid off a mortgage on the property of $167.50, and had the mortgage assigned to her.

The plaintiff in rebuttal denied that he had told the witnesses enumerated above that he wished to deed the property to his daughter, and reaffirmed that he had only intended to make a will in her favor.   He denied that his dead wife, who had willed the property to him, had told him that she loved Augusta, and wanted her to have the property.   He said that his dead wife had never seen Augusta, and had never expressed herself as having any affection for her.

The chancellor found in favor of the defendant, and the complaint was dismissed for want of equity.

We think the decision of the chancellor was wrong.   The whole substance of the transaction shows that the deed was procured by the fraud and undue influence of the defendant practiced on her father.   All the testimony shows that his hearing was very defective, that he did not understand the English language very well at best, and that it was with great difficulty that ordinary business matters were explained to him.   The witnesses for the plaintiff say that they were never sure whether he understood them when they were conversing with him about business matters.   One of them says that he had frequently to call in his brother, who understood the Spanish language, to interpret for him.   It is true the wit-

nesses for the defendant testified broadly that it was explained to him by his daughter that he was making a deed, and that he seemed to understand that it was a deed and not a will that he was executing. But, when the testimony is considered in connection with all the other facts and circumstances introduced in evidence and the relative situation of the parties, we do not think it can be said that the testimony shows that the plaintiff understood that he was executing a deed. On the contrary, we think that a preponderance of the testimony points to the conclusion that the old man thought he was only making a will in favor of his daughter. It is not probable that his dead wife, from whom he obtained the property, had any interest in the defendant. She was not the mother of the defendant, and had never seen her. It will be noted also that the old man, at the very time he made the deed, had no other means of support, except the property in controversy. His own daughter admits that her step-sister and her husband had to bring them food. From the testimony of Mrs. Lighter it appears that her testimony to the effect that the plaintiff understood that he was making a deed and not a will was obtained from the conversation between father and daughter. She says that the daughter would explain the transaction to the father, and would repeatedly ask him if he understood it, and the father would reply, "Yes." It is evident then that she did not understand herself whether or not the plaintiff appreciated what he was doing because, as she said, the father and daughter would talk together, and then, as above stated, when the daughter would ask him if he understood it, he would say "Yes."

From Mr. Lighter's testimony, it appears that the plaintiff was nearly crying when he made the deed. He admits that the plaintiff used broken English, and that his daughter had to explain everything to him. So we have before us the case of an old man, whose hearing was defective, and whose knowledge of the English language was very limited, deeding all his property to his daughter, who had never lived with him and toward whom he had never manifested any affection prior to this time. It is not claimed that the daughter intended to support him or to help take care of him in his old age. Her own testimony shows that the plaintiff at that time had nothing

in the house to eat, and that his stepdaughter supplied him with food. As soon as the plaintiff ascertained that the defendant claimed to own the property and attempted to take possession of it, he denied her right to do so. The deed was not recorded until in February, 1911, after the daughter had left her father's home and had married. After the deed was executed, she paid off a mortgage on the property and, instead of having the mortgage satisfied, as would have been natural if she thought she owned the property, she had it assigned to her. When all the facts and circumstances detailed in evidence are considered together, we are led to the conclusion that the daughter persuaded her father that he was only making a will in her favor, and that he did not understand, when he signed the paper writing in question, that he was executing a deed. *Hightower v. Nuber,* 26 Ark. 604.

The decree will be reversed, and the cause remanded with directions to grant the prayer of the complaint.