HAWKINS v. RANDOLPH.

Opinion delivered June 6, 1921.

1. CONTRACTS—MENTAL CAPACITY.—The law does not draw any discriminating line by which to determine how great must be the imbecility of mind which will render a contract void, but each case will be found influenced by its own peculiar circumstances.

2. MORTGAGES—RELEASE SHOWING MENTAL INCAPACITY.—In an action to set aside for mental incapacity a release of a mortgage for $10,000, bearing 6 per cent., executed by an aged and illiterate mortgagee in consideration of the mortgagor's unsecured undertaking to pay the mortgagee $480 per year during the remainder of his life, evidence *held* to show the latter's incapacity.

3. CONTRACTS—FIDUCIARY RELATIONSHIP.—The rule that transactions between persons connected by fiduciary relations will be closely scrutinized will be applied whenever the relation between parties gives one a controlling influence over the other.

4.   CONTRACTS—INADEQUACY OF CONSIDERATION.—Where parties are capable of contracting, courts will not set aside their contracts for mere inadequacy of price; but where the inadequacy is accompanied with other facts showing concealment on the part of one who obtains a benefit on account of old age, ignorance, incapacity, etc., on the part of the one granting the benefit, equity will grant relief.

Appeal from Franklin Chancery Court, Ozark District; *J. V. Bourland,* Chancellor; affirmed.

### STATEMENT OF FACTS.

Robert H. Randolph brought this suit in equity against S. B. Hawkins to annul and set aside a contract whereby the plaintiff released in favor of the defendant, a mortgage on a tract of land to secure an indebtedness of $10,000.

On the 7th day of July, 1919, R. H. Randolph executed to S. B. Hawkins a deed to 183 acres of land in Franklin County, Arkansas, for the consideration of $12,500. Of this amount $500 was in cash and the balance in five promissory notes. The first note was for $2,000, and the remaining four notes were for $2,500 each. The first note fell due on January 1, 1920, and one each year thereafter. Hawkins gave Randolph a mortgage on the land purchased to secure the payment of these notes. The defendant paid the first note when it fell due, and subsequently the parties entered into a contract as follows:

"This agreement, made and entered into this 9th day of March, 1920, between S. B. Hawkins, party of the first part and R. H. Randolph, party of the second part, witnesseth, that, in consideration of the release of a certain mortgage dated September 10, 1919, and the return to the said S. B. Hawkins of the notes secured by said mortgage, it is hereby understood, contracted and agreed that the said party of the first part, his heirs and assigns, executors and administrators shall pay unto said R. H. Randolph or his assigns, during the period of his natural life the full sum of four hundred and eighty dollars ($480) each and every year during such life, payable quarterly on the first days of April, July, October and

January, beginning on the first day of April, 1920, with the amount of $120 and paying said amount as aforesaid at the beginning of each quarter thereafter so long as said R. H. Randolph shall live; it being the idea of this contract and the intention of the parties to afford said party of the second part an annuity of $480 for the term of his natural life, payable quarterly in advance, and that at the time of his death such payments shall cease and no further obligations shall thereafter rest upon the said S. B. Hawkins by virtue of this contract or the securities surrendered in consideration of this contract.

"In witness whereof the parties have hereunto set their hands this 9th day of March, 1920."

Pursuant to the terms of the contract, Randolph on the same day executed a release deed to Hawkins to the property described in the mortgage. The object of this suit is to cancel the contract and the release deed executed by Randolph to Hawkins.

R. H. Randolph was a witness for himself. According to his testimony, he resided on his land in Franklin County, Ark., but transacted his business at Mulberry, in Crawford County, Ark. For many years he had transacted his business with a bank at that place of which S. B. Hawkins was the cashier. Randolph was an uneducated man and could not read or write, except to sign his name. Hawkins had acted as his confidential adviser for about thirty years. Randolph was a widower without children and was about eighty years of age when he conveyed his land to Hawkins and took a mortgage back to secure the payment of the purchase money. The contract which is the basis of this lawsuit was written by the attorney of Hawkins in a back room of his bank. The lawyer commenced to read the contract to Randolph and Hawkins took it from him saying that the contract was all right, and that it was not necessary to read it over to Randolph. Randolph was just getting over a case of influenza and did not recollect signing the release deed. Hawkins gave Randolph a certificate on the bank for $120 on April 1, 1920. Subsequently he mailed Ran-

dolph a quarterly payment for a similar amount. Randolph then began to realize what had been done and sent the money back to Hawkins.

On cross-examination Randolph admitted that he had attended to his own affairs all of his life and felt that he was competent to do so when at himself. He stated that he was sick when the contract in question was executed. He admitted that he boarded with Jack Underwood in March, 1920, but denied telling him that he wanted to sell his land for the reason that the road and other taxes were eating it up. He denied telling Underwood that he would like to turn his mortgage over to some one and draw $40 a month on it like he (Underwood) was doing with the government. Randolph further stated that as soon as Mr. Chew explained the meaning of the contract to him he immediately authorized him to bring this suit.

The defendant, S. B. Hawkins, was a witness for himself. He admitted having known Randolph for thirty years, and that he had bought the land from him at the time and on the terms described above. In March, 1920, Randolph came to Hawkins and wanted him to pay him a pension. Randolph called it a pension. He reminded Hawkins that he had sold the land to Stewart, and that the mortgage would be in the way. Randolph wanted to release the mortgage so that Hawkins could go on with his trade. Hawkins wrote for his attorney to come down, and on the next day the attorney came to town and the contract in question was executed. Hawkins asked Randolph how much he wanted, and Randolph said that he would have to have $440 per year. Hawkins replied, "That is all right. If that will keep you comfortable. It is all right with me." The attorney prepared the papers and they were signed in duplicate the next day. After he had acknowledged the release deed, Randolph said, "You ought to have this recorded." Hawkins replied that he would mail it right away. Randolph then said, "No, that is a valuable paper, it might miscarry or get lost in the mail. You ought to send it by some one." Hawkins said, "All right, I will send it by my son and

have it recorded,'' and he did so. Randolph came to Hawkins a few days later, and said he ought to have $480 a year. Hawkins said, "All right, Uncle Bob, if you need $480, we will make it $480." Hawkins then took both copies and changed them to read $480 per year. On the first day of April, 1920, Hawkins placed $120 to Randolph's credit and Randolph seemed satisfied. On July 1, 1920, Hawkins mailed him a check for $120 and Randolph returned it. When they first talked about the contract in question, Randolph told Hawkins that the taxes were eating him up, and the people were wanting him to invest his money.

C. R. Starbird, the attorney for Hawkins, said that when he first got to the bank, Randolph was there waiting for him. Hawkins introduced them and sent them into the back room to fix up the business. From the way Randolph commenced talking, Starbird thought that he wanted to make a will. Randolph replied that he did not want to make a will, but that Hawkins was to give him a pension. He told Starbird that he wanted one just like Uncle Jack Underwood was drawing. Starbird then asked him what amount the pension was to be, and Randolph said that they had not yet agreed on the amount. Hawkins was called into the room, and Starbird told him that they would have to agree on the amount. Hawkins said, "Uncle Bob, tell us how much you want?" Randolph said that he thought about $440 a year. Hawkins said that is all right and left the room. Starbird then took a memorandum of the contract and prepared it at his office and then mailed it to Hawkins.

According to the testimony of Jack Underwood, Randolph was boarding at his house and told him that a new road was being built past his place, and that he had sold his land to get rid of the taxes which were eating it up. He stated further that he had a mortgage for $10,000 on his land and that the taxes would eat that up. That he wished some one would take that and give him a pension like he (Underwood) was drawing. Underwood then suggested that he should talk with Hawkins about it, and Randolph said that he would go right up

and see Hawkins about it. A few days later Randolph told Underwood about the execution of the contract in question.

Mrs. Jack Underwood testified that she heard Randolph tell her husband that the taxes were eating him up and that he wished he could arrange to have some one pay him a pension just like her husband drew from the government and that he would turn over his $10,000 mortgage for it. Subsequently she heard Randolph tell her husband that he had drawn his pension.

Mrs. Bettie Conatser testified that Randolph told her that he had released the mortgage which Hawkins had given him, and that Hawkins had agreed to pay him $40 a month as long as he lived.

A physician who treated Randolph for influenza in March, 1920, testified that he could not see that Randolph's mind was affected by the disease.

An employee of the bank of which Hawkins was the cashier took Randolph's acknowledgment to the release deed and corroborated Hawkins as to what took place when the contract and deed were executed.

The chancellor found in favor of the plaintiff, and it was decreed that the contract of March 9, 1920, should be canceled, and that the release deed should also be canceled.

It was further decreed that the mortgage on the land and the four notes given by Hawkins to Randolph in payment of the land should be in full force and effect. The defendant Hawkins has duly prosecuted an appeal to this court.

*Evans & Evans, J. P. Clayton* and *Starbird & Starbird,* for appellant.

1. It is contended that the release of the mortgage by appellee and the contract were not really agreed to by appellee, but his signaure was abtained by fraud and false representations. This is denied by appellant. It is also contend that, by reason of age, sickness and mental infirmities, appellee was incompetent to make the contract entered into and the release executed by him. Ap--

pellant resists these contentions upon the facts proved. The evidence is not clear, cogent nor convincing, so as to satisfy the mind beyond reasonable doubt. 71 Ark. 615; 82 *Id.* 569; 96 *Id.* 564-6; 130 Ark. 312-22; 132 *Id.* 227-36. The testimony of interested parties is insufficient to overthrow the presumptions which the law throws around written instruments.    96 Ark. 564.

2.    This was an executed contract.    An accord and satisfaction for less than the amount due is good, if executed.    44 Ark. 252-4; 70 *Id.* 215-20.    An executed release is good without any consideration.    44 Ark. 252.    The receipt of part of a debt not yet due in satisfaction of the whole is a sufficient consideration, even if the contract is executory.    70 Ark. 215; 33 *Id.* 572; 6 R. C. L., § 74, p. 666; 46 So. Rep. 598.    From these cases it follows that inadequacy of consideration is no defense to an executed contract.    23 Ark. 735-8; 129 *Id.* 377; 86 *Id.* 464; 99 *Id.* 238-241; 117 *Id.* 552.

The conveyance of one's land to another upon an agreement of support for the life of the grantor is a good contract upon adequate consideration.    This was Randolph's object and intention.    Great age alone is no defense.    119 Ark. 466.    The decree of the chancellor is clearly against the preponderance of the evidence.

*Sam R. Chew*, for appellee.

1.    No sufficient abstract was filed under rule 9 and the decree should be affirmed.

2.    Inadequacy of price paid for land, though not controlling, is a circumstance to be given due weight in cases of this kind.    The facts condemn this pretended    contract    as    improvident,    and    appellee, being *non compos* and down and out with senile dementia,    the    contract    was    void.    The    pretended contract    and    release    is    tainted    with    fraud    and void.    Bispham on Equity Jur. (4 ed.), § 219; 38 Ark. 433; 40 *Id.* 28.    Improper influence and undue influence were shown and relief was properly given.    26 Ark. 28. Where one, through age, infirmity and decrepitude or disease, is incapacitated from managing his affairs, an

unreasonable or improvident disposition of all his property will be set aside in equity. 84 Ark. 490. This case is on all-fours with the present case. The decree below is responsive to the law and the facts. After hearing all the testimony, the chancellor found for appellee, and the decree is sustained by a clear preponderance of all the evidence.

HART, J. (after stating the facts). We think the decision of the chancellor was correct. In the case of *Kelly's Heirs* v. *McGuire,* 15 Ark. 555, the court recognized that the law does not seem to have attempted to draw any discriminating line by which to determine how great must be the imbecility of mind to render a contract void; or how much intellect must remain to uphold it. The reason that no exact general rule as to incapacity to contract can be laid down is because each case will be found influenced by its own peculiar circumstances. In discussing the subject the court said:

"While the solemn contracts between men should never be disturbed on slight grounds; yet it may, perhaps, be assumed, as a safe general rule, that, whenever a person through age, decrepitude, affliction, or disease, becomes imbecile, and incapable of managing his affairs, an unreasonable or improvident disposition of his property will be set aside in a court of chancery. *In re James Barker,* 2 Johns. Ch. Rep. 232.  * * *

"If a contract is freely and understandingly executed, by a party, with a full knowledge of his rights, and of the consequences of the act, it must stand. This court disclaims all jurisdiction to interfere on account of the improvidence or folly of an act done by a person of sound though impaired mind. But, on the other hand, contracts have been set aside and canceled, when want of consideration, or the improvident nature of the transaction has raised the presumption that fraud and misrepresentations were employed. Shelford on Lunacy, 267. When a gift is disproportionate to the means of the giver, and the giver is a person of weak mind, of easy temper, yielding disposition, liable to be imposed on, the court will look upon such gift with a jealous eye, and

strictly examine the conduct and behavior of the person in whose favor it is made, and if it can discover that any acts or stratagems, or any undue means have been used, to procure such gifts; if it see the least speck of imposition, or that the donor is in such a situation with respect to the donee as may naturally give him an undue influence over him; in a word, if there be the least scintilla of fraud, a court of equity will interpose.'' (Citing cases.)

The court has continued to recognize this as the general rule since that time. *Campbell* v. *Lux*, 146 Ark. 397, and *Nelson* v. *Murray*, 145 Ark. 247. In the application of the doctrine to the facts of the present case it may be said that the evidence shows that Randolph freely and willingly entered into the contract in question and executed the deed of release to the mortgage; but his action, measured as it must be, by the testimony of the witnesses as to the circumstances surrounding the transaction, does not show that intelligent participation characteristic of one who understands what he is doing and comprehends the nature of his act.

The evidence shows that Randolph and Hawkins had lived on the terms of the closest friendship for thirty years, and that Randolph always advised with Hawkins in regard to his affairs. He had full confidence in his judgment and integrity. He was an uneducated man and usually followed the advice of Hawkins in all his business transactions. Courts regard with a jealous eye transactions between persons connected by fiduciary relations. The principle is not confined to technical cases of fiduciary relationship. It is applicable to all cases where the relation between the parties gives one the controlling influence over the other.

It is true that, where the parties are capable of contracting, courts will not set aside their contracts for mere inadequacy of price, but where the inadequacy is accompanied with other facts showing concealment on the part of the one who obtains a benefit on account of

old age, ignorance, incapacity, etc., on the part of the one granting the benefit, courts of equity will readily grant relief.

The direct testimony of the witnesses, standing alone, shows that Randolph had always been capable of attending to his own affairs, and that he still had intellect enough to make a disposition of his property, but his situation and the surrounding circumstances are proper to be taken into consideration in determining whether a court of equity should interpose. Randolph was over eighty years of age, and was an ignorant person, unable to read or write. Hawkins had been his confidential adviser for thirty years. Randolph had already sold him his farm and had taken a mortgage back to secure most of the purchase price. His fears about the taxes eating up his lands were groundless; for after the sale he had nothing to do with paying the taxes on the land. Hawkins owed Randolph $10,000, which was secured by a mortgage on the farm. Randolph exchanged this secured indebtedness which bore interest at the rate of six per cent. per annum for an agreement on the part of Hawkins to pay him an amount annually which would be less than the interest. The only benefit that he could possibly derive was to receive this payment quarterly instead of annually. While his mortgage was taxable, there is nothing to show that exorbitant taxes were about to be assessed against it.

The whole substance of the transaction was to give up a secured debt of $10,000. bearing interest at six per cent, per annum. for an unsecured debt of $480 annually for the rest of his life. If Randolph had lived twenty years longer, which is altogether improbable, these small payments would not have consumed the principal. much less the interest. The interest would have amounted to $600 per annum as against $480 under the new contract. It is evident that Randolph thought that he was getting a pension, and that Hawkins knew that he thought so. This fact is shown, not only by the testimony of Hawkins himself, but by the testimony of the witnesses introduced by him. Now a pension is a regular allowance paid to

an individual by the government in consideration of past services, or in recognition of merit. The whole resources of the government are pledged to the payment of pensions. Here, as we have already seen, Randolph already had the obligation of Hawkins to pay him $10,000 with six per cent. interest per annum, and in addition this obligation on the part of Hawkins was secured by a mortgage on the land. Randolph exchanged this for the unsecured promise of Hawkins to pay $480 per annum as long as he lived.

The record shows that the amount promised was no more than sufficient to support Randolph in his old age if he continued in reasonable health. If he became sick and his expenses thereby materially increased, it will be readily seen that he had deprived himself of the means of being supported and cared for in that condition, while if he had retained his property he would have had ample means for that purpose. It is just such conditions and situations as this that equity scrutinizes closely and always interposes to grant relief.

It follows that the decree will be affirmed.