WAGGONER v. ATKINS.

4-6744                                       162 S. W. 2d 55

Opinion delivered May 11, 1942.

*W. W. Sharp,* for appellant.

*Lee & Moore* and *Marvin B. Norfleet,* for appellee.

GRIFFIN SMITH, C. J.  The complaint alleged, and the chancellor found, that F. R. Atkins was mentally incompetent May 19, 1932, when for $360 he sold to J. M. and Julia Waggoner a remainder in lands now estimated to be worth more than $12,000.[1]

---

[1] By his father's will, F. R. Atkins' estate was subject to the life tenure of the testator's wife.  In the deed to the Waggoners there is this provision:  "The said F. R. Atkins  .  .  .  makes this deed subject to the life estate of his mother, Mrs. Lillie M. Atkins Marston, and also subject to whatever right of dower, if any, his present wife, Mrs. Mabel W. Atkins, may have."

Suit was brought October 12, 1939. by Mabel Atkins as next friend of F. R. Atkins. Cancellation of the deed was asked.

Atkins married in 1902 and the two have lived together intermittently since that time. They have one child, a daughter twenty-eight years of age. As an evidence of her husband's mental attitude, Mrs. Atkins testified he threatened "to take poison" if she did not marry him. The husband's father was a wealthy planter, residing at Holly Grove, in Monroe county. The life tenant remarried and became Mrs. Lillie M. Marston. She was eighty-three years of age when death occurred May 14, 1939. The family home was built at a cost of $9,000. Mrs. Marston created a trust fund in favor of her son, from which he receives $300 per month. Other property inherited by Atkins produces revenue.

In 1929 or 1930, Atkins took his wife and daughter to Atlanta, where they resided temporarily. He secured employment with a collection agency and worked for several months. His discharge resulted from a controversy over accounts. Atkins then secured employment with a company compiling city directories, but lost the position on account of excessive drinking. Mrs. Atkins returned to Arkansas on business. Shortly thereafter, her husband went to North Carolina, and at a still later date the couple's daughter, Juanita, also went to North Carolina and remained about eighteen months. Atkins resided at Asheville and Winston-Salem; also at Salisbury, where he became acquainted with J. M. Waggoner, an attorney, whom he employed in connection with contemplated litigation.

There is testimony that while in North Carolina Atkins spent money rather freely on the young daughter of his landlady, and that in other instances he associated with the opposite sex. North Carolina witnesses affirmed his intellectual stability, while others thought excessive drinking and use of narcotics had dulled mental processes to such an extent that he was incapable of understanding the nature of business transactions. Some of those who gave depositions referred to Atkins as a pleas-

ant, intelligent conversationalist: a man who loved companionship and sought acquaintances and read a great deal; others regarded him as morose, habitually under the influence of drugs or liquor, and difficult to deal with.

During Atkins' stay in Atlanta, and while he was in North Carolina, Mrs. Marston made regular remittances. At one place in the record the allowance is referred to as $150 per month. Again, it is spoken of as $75.

It is indicated that the people with whom Atkins boarded were interested in procuring a sizeable portion of his surplus funds. Mrs. J. K. Campbell, Atkins' landlady, had known him a number of years before he lived in her home. Atkins, she testified, promised to do certain things for her daughter, Mary King: "Due to Mr. Atkins' liberal spending on Mary (and I, being unable to give my other daughter the same) there developed a feeling of discontent and jealousy between the sisters. I therefore objected to the expenditures Mr. Atkins was making."

J. M. Waggoner, a resident of Salisbury, says Atkins came to his office accompanied by L. M. Hart,[2] Mrs. Campbell's father, and Mary King's grandfather. Atkins crossing by automatic control; that these flasher lights asked Waggoner to prepare a will, "leaving everything" to Mary King. Waggoner testified Atkins said his wife had refused to live with him and had poisoned their daughter's mind against him. Circumstances surrounding execution of the deed, as related by Waggoner, are shown in the footnote.[3]

---

[2] Hart died prior to the time Waggoner testified.

[3] "Sometime in April or first of May, 1932, Mr. Atkins came to me for legal advice, and after investigation, I advised him of his rights. Later he approached me about the sale of his interest in the land described in the deed, recorded Deed Book 36, page 123, records Monroe county, Arkansas. Mr. Atkins explained that his mother had a life interest in this land. He also wanted to sell it subject to the rights of dower his wife might have. I told Atkins I was not interested in buying any property that far from home. Atkins came back a number of times and finally said he was going to sell his interest in this property to someone; that his father's will covered property in Arkansas and Tennessee, and it was probated and on record in Memphis, Tennessee. I obtained a copy of the will and found Atkins did have an interest. Upon having some lawyer in Clarendon, whose name I do not recall, check the records to see if Atkins had ever sold the

In August or September, 1934, Atkins left North Carolina and went to Forrest City. In 1937 he moved to Holly Grove and boarded with a family named Kerr nearly a year. While the family home was being remodeled, Mrs. Atkins spent about half of her time with the Kerrs. Of her husband's conduct she says that ''In addition to spending money for liquors and drugs, Mr. Atkins spent a great deal on young girls, . . . the object of his latest affection being a waitress at Holly Grove.''

Two medical witnesses—Drs. N. E. Murphy and W. H. Martin—testified that in their opinion Atkins was not competent to transact business. Dr. Murphy, of Clarenden, 69 years of age, went to Clarksdale, Mississippi, in 1927, to see Atkins, ''who was in bad mental condition. . . . He had been taking some kind of 'dope.' The case is chronic, and due to his condition from 1927 on, I do not think he had ordinary business judgment.'' Dr. Martin, of Holly Grove, who during a period of twelve or fifteen years had seen Atkins at intervals, characterized him as an alcoholic, ''mentally unfit for the transaction of ordinary business affairs.''

Dr. Chas. W. Gaskins, of Asheville, North Carolina, treated Atkins in 1924 from June, and for several months during 1935. The patient was an habitual user of alcoholic beverages and sedatives. Those who take allonal or veronal excessively become mentally deranged ''at least

property, and receiving a reply that the records did not disclose that property had been disposed of, I then paid Atkins $360, the price he asked for his interest, and took his deed subject to any right of dower his wife might have. Mr. Atkins set his price for the land and refused to reduce it. Atkins did not say or do anything that indicated his mind was unbalanced or that he was incapable of making a contract, executing a deed, or appreciating the consequences of his acts. Atkins understood fully what he was doing. I did not ask Atkins to sell the land. He approached me about selling his interest. My impression of Atkins was that he was a very well-informed man and was a person with strong likes and dislikes and fully capable of taking care of himself. I did not conceal the fact of purchase; on the contrary, I wrote Mrs. Marston that I had purchased, and asked if she would be interested in disposing of her life estate. Atkins was very frank about the matter and told me that his mother was 70 years of age, and at that time in good health; that the land had been good, but was in rundown condition. When I purchased the land it practically had no market value whatsoever. It was during the worst of the depression and lands, stocks and bonds, and all commodities, were at low ebb. Many banks were closed and money was hard to get.''

for the duration of period in which they are taken." When not under the influence of alcohol or drugs, Atkins' mental condition "was such as to enable him to understand an ordinary transaction and to know the consequences of his acts and deeds."

Dr. J. M. Neel, dentist, of Salisbury, had frequent opportunities to observe Atkins. At times he would appear nervous, at other times calm. When Atkins was sober and his nerves settled, he was capable of exercising judgment: could understand any, ordinary business affair. He was not a man of dissipated appearances except when intoxicated.

There was other testimony that Atkins, while at Asheville, Salisbury, or Winston-Salem, would spend evenings in a hotel. His demeanor was that of a capable man of understanding who was interested in current events and eager for conversation and companionship.

In 1938 Atkins was elected justice of the peace for Duncan township, Monroe county, and has served since that time. The election was uncontested, Atkins having been chosen by voters who "wrote in" his name. Of his conduct as an officer, Carl J. Williamson, state game warden, testified:

"I see Mr. Atkins almost every day, and talk with him. He is of average intelligence and information on every-day affairs, and on national affairs. I have seen him try cases. He is one of the fairest justices of the peace they have ever had there. He takes an interest in the man who breaks the law as well as those who try to enforce it. He questions witnesses intelligently, knows how to look up the law; and his conduct at a trial indicates that he understands all he is doing. I think Mr. Atkins would be a little above the average—he is better educated than most people. As long as he is sober his mind is as good as it ever was. When drunk, like every one else, his mind is not clear. He is perfectly capable of trying cases and determining the guilt or innocence of those accused."

John W. Kornegay, county judge, testified regarding quorum court. In November, 1940, Atkins partici-

pated in that body's deliberations "as much or a little more than some of the others." This witness thought Atkins' questions were intelligent and to the point.

An abstract shows a dozen misdemeanor cases tried by Atkins.

Mayo and Mayo, largest supply merchants at Holly Grove, deal with Atkins regularly. They advanced $500 for his use in paying miscellaneous bills and were given an order directing that $50 monthly be withheld from the item of $300 per month sent by the trustee. Mrs. Atkins admitted her husband attended to his business affairs, at least in part, such as collecting certain rents, paying bills, making purchases, and in dealing with matters generally. The Holly Grove marshal testified he saw Atkins regularly and regarded him as a sane, normal man, although addicted to the drink habit.

As argument supporting the claim of mental incompetency, Mrs. Atkins told of her husband's action in surrendering a life insurance policy and collecting $1,800 in cash. Proceeds were used to defray expenses of a trip to the San Francisco World Fair. Atkins started with his wife and her two sisters. At Kansas City Mrs. Atkins became ill and returned home, but her husband and two sisters went on and were gone three weeks. Shortly prior to this time Atkins' mother had died and left an estate of "something over $100,000."

More than seven years intervened between execution of the deed and Mrs. Atkins' suit. The deed was recorded four days after its date.

Appellants rely upon § 8918 of Pope's Digest, and insist the action is barred. Appellee thinks she is protected by § 8939, which gives to insane persons three years after removal of disability to disaffirm.

Perhaps no branch of jurisprudence is more elusive than that dealing with one's mental capacity to contract. Law books are replete with comments by text- and opinion-writers who have sought, figuratively, to ascertain where the strip of herbage lies ". . . that just divides the desert from the sown"; yet all too often have their labors been in vain.

If the brain has become so affected, irrespective of cause, as to appreciably contracept a person's power to reason, and in consequence the ordinary affairs of life are but dimly reflected on that mirror called mind, it is generally agreed that the impulse to act is not a result of intellectual motivation; hence, the attendant infirmity intervenes and protects one so afflicted from the penalty of conduct in respect of which the power to think and to plan according to accepted formulas is non-existent. See *Pulaski County* v. *Hill,* 97 Ark. 450, 134 S. W. 973.

We are confronted with a situation where a rich man's son had for many years yielded to the urge for physical satisfaction, yet interwoven in the social pattern there are evidences of finer impulses and an obvious desire to compose antagonistic natures. Whether Atkins was sane or insane when the land was sold is unimportant if there was failure to sue within three years from restoration of his mental faculties. It is our view that in 1932 he was capable of understanding; nor has there been a prolonged period within three years when he has been incompetent to such an extent as to justify a court in holding that he did not have capacity to reason regarding business matters and to appreciate their significance.

It should be remembered that when the remainder was sold, values everywhere were depressed. Lands could be bought for a fraction of their former worth. Persons who had ready money for investment were timid. Atkins' mother was living, and although she was past seventy and life expectancy was short, there was a possibility she might live many years; and she did survive until 1939. There is nothing to indicate a plan on Waggoner's part to overreach. The rule that frank disclosure must characterize transactions between lawyer and client is not applicable because the only evidence is that Atkins suggested selling the land. No fiduciary relationship existed.

That Atkins drank to excess and used drugs is evidential, but not controlling. Many witnesses who have not been quoted testified, some asserting incapacity, others expressing belief in Atkins' ability to understand the nature of business transactions and to appreciate

consequences of his acts. With an inheritance in expectancy of more than a hundred thousand dollars; with his needs constantly met by parental solicitude as a result of which money's value was seldom appraised or weighed against desire, it is not strange that Atkins should have made a bargain on impulse in order to satisfy temporary whims. But this does not necessarily point to insanity; nor are other circumstances and acts sufficient to overcome the presumption that one who contracts intends the natural consequences of his conduct, and that he had the capacity to elect.

The decree is reversed, and the cause is dismissed.