INMAN *v.* McEACHIN.

4-7055                                               184 S. W. 2d 949

Opinion delivered January 29, 1945.

*Edward H. Coulter* and *Talley, Owen & Talley,* for appellant.

*Fred A. Isgrig,* for appellee.

GRIFFIN SMITH, Chief Justice. If Probate Court did not err in holding that Leonard L. McEachin had testamentary capacity, other matters urged by appellants become unimportant.

The will was executed June 13, 1940. After making four specific bequests—three for $1,000 each and one for $2,000—the residuum was devised and bequeathed to Union National Bank in trust, to be invested in securities. It was directed that the income be paid to the testator's uncle, John A. McEachin, a resident of Oklahoma. Death of the uncle terminated the trust as to him; whereupon the trustees were directed to convey all remaining assets to Margaret Ann Candler, of Sallisaw, Oklahoma.[1]

Leonard died January 9, 1941. He was a resident of Little Rock; hence the will was offered for probate in Pulaski County. An order admitting it was made January 16, 1941, the attesting witnesses being A. F. House and Mary L. Jett.

April 2, 1942, relatives of Leonard McEachin, who but for the will would have participated in the estate, filed complaint in which it was sought (1) to temporarily enjoin the executor from making payments without notice to the plaintiffs and a court order; (2) upon final hearing to set aside the judgment admitting the will to probate, and (3) to "establish the lawful surviving heirs of Leonard L. McEachin, their respective interests in his estate," and to adjudge such general relief as the plaintiffs might be entitled to.

Personal conduct of the testator, his addiction to alcoholic drink, a congenital blood impairment, deterioration of brain tissues as a consequence of the disease, irrational acts following death of his father, and again when

---

[1] In respect of the gift to Margaret Ann Candler, (a cousin) the will recites: "It is the intention hereof to vest in her an unconditional and fee simple title to all of the assets of the trust estate upon the death of the said John A. McEachin."

his mother died—these and other things were testified to in an effort to vacate the probate judgment.

The record contains more than twelve hundred pages, skillfully abstracted in 180 pages. A single hypothetical question propounded to a brain expert covers thirteen printed pages. Assuming that the plaintiffs "made out a case," *prima facie*, there was testimony by disinterested witnesses that Leonard was not a constant drinker; that he possessed an unusually alert mind, and that, with the exception of periods of depression, and times when he was suffering from the effects of drunkenness, his mind was alert, his personality pleasing, and his capacity for business was at least that of the average person. The lawyer who wrote the will (one of the State's best, whose professional status and character are such that he would not knowingly abet a wrong) testified that Leonard was rational in all respects. Another witness spoke of the testator's attitude as that of a seemingly prudent person who at the office of an attorney inquired whether letters had been written to a debtor whose note had been placed with the law firm for collection. The time was drawing near when limitation might be pleaded.

Mrs. Savannah Young, Leonard's mother's sister, testified regarding her nephew's conduct when he visited her in Seattle, Washington. Although professing the deepest love for her kinsman and emphatically declaring that she "adored him," Mrs. Young asserted he told her that he suffered from congenital syphilis. He was constantly drunk, took large quantities of amytal, luminal, barbital, paraldehyde, and other "nerve" medicines, and also engaged in unnatural practices with a young man who visited in her home. In spite of the information she claimed to have had, Mrs. Young executed a will in which Leonard was made sole beneficiary. This, or a copy, was mailed to him. It was received June 12, 1940. The following day Leonard had his own will written, and executed it. There is testimony that upon receiving the document from his aunt, Leonard remarked, "Well, I'll certainly not be roped in by anything like that."

There is nothing extraordinary or unnatural in the way Leonard disposed of his estate, amounting to approximately $50,000. His first thought—no doubt suggested by the letter just received—was of Mrs. Young. To her he bequeathed $1,000. The next gratuity went to an old friend, J. Frank Hall, of Memphis, then manager of the Memphis office of Mutual Life Insurance Co. Mr. Hall has since died. Two thousand dollars went to Rose Marie Godwin. The bequest was coupled with the expression, "It is my wish that she use this money for educational purposes." Hugh Godwin, the girl's father, was referred to by witnesses as an employe "who had faithfully worked for both of Leonard's parents for many years." The fourth specific bequest was $1,000 to Ben Mason. Here, too, a wish was expressed that the money be used to aid in the beneficiary's education. The recipient was a son of Addie Mason, who had been employed by Leonard's mother. Close ties of affection existed between Leonard and the uncle who received for life all income from the trust fund. Likewise it is shown that the cousin who upon the death of her grandfather (the life beneficiary) received the remainder absolutely was fond of Leonard, and he of her.

This is a case for application of the rule laid down in *Puryear* v. *Puryear*, 192 Ark. 692, 94 S. W. 2d 695, where the late Mr. Justice BUTLER, speaking for the Court, said that the contents of a will, the manner in which it was written and executed, the nature and extent of the testator's estate, his family connections, their condition and relative situation to him, the terms upon which he stood with them—all these may be inquired into in determining the testator's capacity:—"Neither feebleness of intellect nor physical suffering is sufficient to render a will void unless so great as to render the testator unable to appreciate the consequences of his acts."

A grantor's capacity to execute a deed was alleged in a suit reaching this Court on appeal in May, 1942. *Waggoner* v. *Atkins*, 204 Ark. 264, 162 S. W. 2d 55. Mabel Atkins, as next friend of her husband, F. R. Atkins, sought to recover lands in Monroe County, Arkansas,

which her husband had conveyed to a North Carolina lawyer in 1932. The grantor was shown to have been addicted to the use of intoxicants and drugs to an extent construed by witnesses for the plaintiff as sufficient to render him mentally incompetent. In reversing the decree which avoided the deed, the law was declared to be that excessive use of drugs and liquors may be shown as evidence supporting a contention that the user had suffered mental deterioration to the point of incapacity, "but [such evidence] is not controlling."

Certainly disposition of property in the instant case does not disclose a lack of understanding or suggest a mental complex. The aunt who appears to have been virtually without property was rewarded for the gesture she made in the matter of her own will, and for some slight affection the testator may have entertained for her. There was nothing unreasonable in Leonard's wish to give a thousand dollars to his Memphis friend; nor should his generosity in respect of two young people whose parents were in poor circumstances be construed as evidence of insanity. Finally, an uncle was given a life income, and the uncle's granddaughter—the testator's cousin—became the final object of the testator's bounty.

We think the Probate Court was sustained by a preponderance of the evidence in holding that the plaintiffs failed to meet the burden of proof. The judgment must be affirmed.