WILSON *v.* WILSON.

4-8269          204 S. W. 2d 878

Opinion delivered October 20, 1947.

*Lee Seamster* and *Sullins & Perkins,* for appellant.

*John W. Nance,* for appellee.

ED. F. McFADDIN, Justice. This is an attempt by appellants, as the collateral heirs of R. B. Wilson, to set aside a conveyance that he made to his wife, Mrs. Cora Wilson (appellee). Appellants claim that at the time of the conveyance, R. B. Wilson was mentally incompetent because of age and illness, and that appellee obtained the conveyance by the exercise of undue influence. The chancery court sustained the conveyance.

Appellants site us to such cases as: *Boyd* v. *Boyd,* 123 Ark. 134, 184 S. W. 838; *Gonzales* v. *Tucker,* 101 Ark. 558, 142 S. W. 824; *Richey* v. *Crabtree,* 198 Ark. 25, 127 S. W. 2d 269; *Kelly's Heirs* v. *McGuire,* 15 Ark. 555; *Jones* v. *Travers,* 116 Ark. 95, 172 S. W. 828; *Parker* v. *Hill,* 85 Ark. 363, 108 S. W. 208; *Hightower* v. *Nuber,* 26 Ark. 604; and *Waggoner* v. *Atkins,* 204 Ark. 264, 162 S. W. 2d 55. Appellee cites us to such cases as: *Hawkins* v. *Randolph,* 149 Ark. 124, 231 S. W. 556; *Pledger* v. *Birkhead,* 156 Ark. 443, 246 S. W. 510; *Boggianna* v. *Anderson,* 78 Ark. 420, 94 S. W. 51; and *Faulkner* v. *Byland,* memo in 201 Ark. 1185, reported in 147 S. W. 2d 37.

The rules of law applicable to a case such as this one are well settled by numerous decisions of this court, which are cited and quoted from at length in our recent case of *Petree* v. *Petree,* 211 Ark. 654, 201 S. W. 2d 1009.

By making reference to the Petree case, we forego the necessity of listing and discussing these rules.

Before proceeding to a consideration of the issues, we give some of the background facts: For more than 40 years R. B. Wilson was the owner of a farm of 414 acres in Madison county, Arkansas. This farm is the property in controversy. For many years R. B. Wilson was a bachelor; but in 1922 he married appellee, Mrs. Cora Wilson. They lived together on the lands herein involved all the years thereafter until shortly before R. B. Wilson's death, which occurred in Fayetteville on March 17, 1946. They had moved to Fayetteville a few months before he died. That Mrs. Cora Wilson was a kind and dutiful wife is clearly established. R. B. Wilson and Cora Wilson had no children. Appellants are his nieces and nephews, who would take some interest in the lands herein involved if the deed to Cora Wilson be held invalid.

About July 29, 1945, R. B. Wilson suffered an illness diagnosed as heart trouble. We will refer to this as the "first illness," because prior to that time his only deficiency was an impaired hearing, which had existed for many years. He was taken to a hospital in Fayetteville on July 29, 1945, where he remained until August 18th. Then he went back to his farm, and there observed his 88th birthday on August 30, 1945. After he returned from the hospital, the deed in question was executed in Fayetteville on September 1, 1945. His mental condition from August 18th to December 23rd is in sharp dispute, and we will refer to this period as the "questioned interval." Of course, the real issue is his mental condition at the time he executed the challenged instrument.

On December 23, 1945, he contracted a cold, and returned to the hospital, and remained there a short time. On January 29, 1946, he made a trip to the bank at Huntsville. Just when he went back to the hospital on account of his final illness is not shown: but, at all events, he died on March 17, 1946. So much for the background facts. Now to the disputed issues.

The appellants contend that after R. B. Wilson's first illness (July 29th-August 18th), he was never mentally capable of transacting business, particularly such as executing the deed in question on September 1, 1945, and that the deed was obtained by undue influence. To support their contentions, we have the testimony of most of the appellants, and a number of relatives, and also some disinterested witnesses; and some of these witnesses testified as to his condition during most of the questioned interval.

On the other hand, appellee claims that after August 18th, through all of September, and up until December 23rd, R. B. Wilson was transacting many kinds of business, driving his car, and going wherever he desired; that his mental condition was excellent on September 1, 1945, and that there was no undue influence. A number of friends and relatives and some disinterested witnesses support appellee's contention; and their testimony concerned his condition during most of the questioned interval.

What, then, is the truth?

The record shows that Mr. Wilson did all of the following things, after August 18th and during the period we have referred to as the questioned interval:

(a) He drove his automobile on numerous occasions. Sometimes he went alone on business trips. On at least three occasions he drove his wife to Fayetteville to see the dentist.

(b) He went to the county fair at Huntsville.

(c) He went to church on several occasions, even attending night services.

(d) He discussed with a tenant on his farm the amount of the corn that the tenant had gathered while Mr. Wilson was in the hospital.

(e) He proposed a sale of land, and insisted that the purchaser take the title as it was, and stand the expense of clearing up any defects; but when Mr. Wilson learned how much income tax he would have to pay, he

decided not to sell, and succeeded in renting the land to the proposed purchaser.

(f)  He went to the bank, and transacted business.

(g)  When he made the deed here in question, he gave instructions as to how it should be drawn, and reserved for himself a life estate.

None of the persons with whom he dealt in any of the above matters doubted his sound mentality. The lawyer who officiated in the drawing of the deed in question, and also the notary public who took the acknowledgement, testified that Mr. Wilson was mentally sound on September 1, 1945, the date the deed was executed.

As we have heretofore said, the evidence was in the sharpest dispute, but with the above facts in the record, we cannot say that the chancellor's findings are against the preponderance of the evidence. On appeal, we have only the testimony on the printed page to aid us. The learned special chancellor saw each witness in person, and heard each witness testify. What we said in *Murphy v. Osborne,* 211 Ark. 319, 200 S. W. 2d 517, applies to this case:

"*The Finding of the Chancery Court will not be Reversed on Appeal unless such Finding is against the Preponderance of the Evidence.* Some of the scores of cases recognized and reiterating this long-established rule are collected in West's Arkansas Digest, 'Appeal and Error', § 1009. In the case at bar the chancellor saw each witness when he testified. The chancellor observed the demeanor on the witness stand, the inflection in the voice and the hesitance or rapidity of the words flowing from the mouth of the witness. The chancellor thus had an opportunity to see more than the mere words on the printed page which, alone, come to this court. With the testimony in this case in hopeless conflict, we cannot say that the Chancery Court decided against the preponderance of the evidence."

The decree of the chancery court is affirmed.