## BEATY *v.* SWIFT.

### Opinion delivered March 27, 1916.

INSANITY—DEFECTIVE CONVEYANCE—MENTAL CAPACITY—IGNORANT **AND** ILLITERATE PERSON.—An ignorant and illiterate person may acquire property and may convey it, provided he knows what he is doing and appreciates and understands the transaction in which he is engaging, and although a grantor is very ignorant, and there is evidence tending to show mental incapacity to make a deed, such deed will be held valid, where the evidence shows that he knew what he was doing and the purpose thereof.

Appeal from Washington Chancery Court; *T. H. Humphreys,* Chancellor; reversed.

*R. J. Wilson* and *McDonald & Grabiel,* for appellant.

1. The court erred in finding that Ann Swift was incompetent and not capable of knowing the nature of the

transaction at the time she signed the deed. The court should have dismissed the bill because Ann had reasonable capacity; she received a valuable consideration and there was no allegation nor proof of fraud, and she had never been adjudicated *non compos.* All the testimony tends to show sufficient capacity. The examination of the experts was wholly improper and illegal. Mere weakness or want of education is not sufficient. She had mental capacity enough to transact ordinary business. 97 Ark. 450; 106 *Id.* 362-8-9; 103 *Id.* 199; 100 *Id.* 618; 87 *Id.* 243; 27; *Id.* 166; 22 Cyc. 1112, 1113; 70 Ark. 166; 17 *Id.* 292; 97 *Id.* 456, 459; 22 Cyc. 1204; 21 Am. Rep. 24, and note, p. 29; 16 Am. & E. Enc. Law. 625.

*J. W. Walker,* for appellees.

The rule as to the admissibility of non expert testimony is stated in 61 Ark. 245; 103 *Id.* 200. The finding of the chancellor is fully sustained by the evidence. 115 Ark. 436; 42 *Id.* 118; 47 *Id.* 455. See also, 55 Ark. 396; 47 *Id.* 455. The overwhelming preponderance of the evidence sustains the finding of the chancellor as to Ann Swift's mental capacity. The decree should be affirmed.

SMITH, J. The court below found that appellee Ann Swift was given a life estate under the will of her father in the land in controversy, and that at the time she executed a deed to the land to one A. S. King, under whom appellant Beaty claims title by deed, the said Ann Swift was not possessed of sufficient mental capacity to know and appreciate her act, or to make a binding deed, and that her attempted conveyance of the land was void. The deed so declared void was dated September 14, 1891. As a result of this finding various collateral questions are presented in the briefs, but the correctness of the above finding presents what we regard as the controlling question in the case.

After Beaty's purchase of the land he improved it, and as a result of these improvements, and the building of a railroad near the land, and the general enhancement of values, the land became much more valuable than it was at the time appellee sold it. Appellant was in pos-

session of the land by a tenant, who commenced moving from the place, but, before all of his effects had been removed, appellee and her husband moved in and took possession of the premises and retained possession until appellant brought an action of unlawful detainer to dispossess them. The cause was transferred to equity, where a guardian was appointed to defend for appellee, and a decree was rendered cancelling appellee's conveyance of the land for the reason stated.

A large number of witnesses—forty-two in fact—testified in appellee's behalf. Much of this evidence is clearly incompetent. For instance, the postmaster at Fayetteville testified that he taught school in the '80's near the home of William Rinehart, who was appellee's father, and that he always understood that Rinehart had a child who was mentally unbalanced, but that all he knew of her mental condition was what he had heard. Other witnesses who are non-experts appear to have stated their opinion without detailing the evidence upon which such opinions were based. Only three persons testified who attempted to qualify as experts, and the usual difference of opinion was found among them. Two of the three testified that appellee did not have sufficient mental capacity to convey land, while the third was of the contrary opinion.

A number of non-experts, however, testified, both pro and con, and gave such detailed statements of the facts and circumstances arising out of their observation of, and association with, appellee as gave them the right to express an opinion, based upon such observation and association concerning appellee's sanity. It appears from the evidence of some of the witnesses that appellee and her husband possessed about the same degree of intelligence. Of course, the husband's sanity was not directly involved in this inquiry, yet the witnesses discussed it more or less, and it is certain that both appellee and her husband possessed very little intelligence and were wholly uneducated. Evidence offered in appellee's behalf unquestionably tends to show that she did not pos-

sess sufficient mentality to execute a valid deed, and this evidence, considered alone, would, no doubt, sustain the finding of the chancellor. But the question is, and we concede it is a close one, whether the chancellor's finding is contrary to the preponderance of the evidence.

It was shown that at the time the deed was made appellee's husband shot a man and, rather than stand trial upon this charge, ran away. He went first to Texas, and later to Tennessee, where he lived for two years, and, learning of the death of the man whom he had shot, he returned to his former home. Appellee left this State about two months after her husband ran away, and joined him in Texas and has lived with him continuously since.

Appellee's brother testified that after Swift shot the man, the land in question was sold to raise money to pay the expenses of Swift's flight. That his sister knew her husband was in trouble, but he could not say how much she knew about it, but he supposed, if it was explained to her, she would have understood. That his sister received $250 in money, and gave him $150 of it to take to her husband, and she retained the other $100. Other heirs who had an interest in the land joined in the conveyance, and the total consideration was $1,000.

Appellee had a life estate under the will of her father in a fourth interest, and she received the same price for this life estate as did the heirs who owned the fee. This brother was asked, "Do you think she has sufficient mental capacity to intelligently dispose of any estate and protect her rights?" and he answered, "I do not think she ever had any ability. In some things she has judgment and in other things she is a blank." A neighbor of many years standing testified, "I think she is pretty weak minded; always thought that. It is my judgment she never was bright. She might know good from evil." Another testified, "I do not think Ann would be very competent. Some things she might know, some she might not." Another brother of appellee testified that his sister knew no more of right or wrong than a child four or five years old, and that she had never de-

veloped mentally. He admitted, however, that in the settlement of his father's estate it became necessary for his sister to execute a deed to him, and this she did, and he thought she knew what she was doing when that deed was executed. Another sister testified that appellee never went to school and could not learn at home, but that she had read in the first reader. That her sister wanted the money to enable her husband to get out of the country, and that she sold her interest in the land for the same price which her sister received. Indeed, the proof appears to greatly preponderate that a fair price was received for the land. Another neighbor testified that appellee did not know right from wrong and could not deal at arm's length in business transactions with men and women; and several other witnesses employed similar language in expressing their opinion of appellee's mentality. It was shown that she possessed a great fondness for pets, particularly cats and dogs, and that she kept a good many of these about her, and talked to them in a childish way, and some of these witnesses who so testified stated that her mentality appeared to be that of a child anywhere from four to twelve years old. She was shown also to have had a fondness for dolls and to have had dolls to play with until she was thirty years old. She was about sixty years old at the time of the trial. Notwithstanding a good many witnesses testified appellee did not know right from wrong, these same witnesses admitted that she did right rather than wrong. That her conduct was decorous and her life simple and blameless, and no scandal had attached to her name. One witness did answer affirmatively the question, "Is she morally depraved?" but he did no after having stated that he did not, understand the question and without having had it explained to him. This witness admitted that he could not himself read or write, and it is very probable that he did not understand the significance of his answer. At any rate, no other witness so testified. Upon the contrary, it was shown that she attended church regularly, and witnesses stated they had heard her testify in church

coherently and that she appeared to enjoy the consolations of religion.  Unquestionably she and her husband were very poor and were ignorant, and it is shown that they had none of the luxuries, and not many of the comforts, of life in their home.  Witnesses described the home as one of squalor, filth and misery.  Yet, for a number of years appellee and her husband kept house, during all of which time she performed all the usual and necessary domestic duties.  She raised chickens and eggs and geese, and other fowls, and carried them to market, and sold them and exchanged them for things needed about her home.  Witnesses in appellant's behalf testified that appellee would talk and understand the affairs of the neighborhood; that she would borrow things and bring them back, and that she raised fine hogs for the market.  One witness asked her how she raised such fine hogs, and she answered, "Us takes care of 'em."  This appears to be characteristic language in which she expressed herself. Other witnesses testified that she talked intelligently and coherently, and while these witnesses conceded that she was of a low order of mentality, they thought she had intelligence enough to know what she was doing and what she wanted to do. Appellee's family physician who had practiced his profession in the vicinity in which she lived for thirty-four years testified that he had numerous conversations with her, and that while she presented a case of arrested mental development she was not an imbecile, nor an idiot, but had sufficient intelligence to understand things ordinarily, to look after her own interests, and to sell her interest in land or deed it away and understand the nature of the transaction, and that he thought she was mentally competent to sign a deed and know the nature of a transaction of that kind.  He expressed the opinion that if she had had the assistance in her youth which science now affords such persons, that she might have made an intelligent woman.

Two doctors testified as experts in appellee's behalf, and the testimony of these physicians is practically identical.  Neither had ever seen appellee until they were call-

ed upon to examine her, which they did together and in the presence of her husband. They expressed the opinion that neither appellee nor her husband appeared rational or to comprehend the simple transactions of life. They tested her reflexes, her ability to discriminate dates, the denomination of currency and her visual capacity. They found that she could not count money, and after making various tests, which were regarded as appropriate to enable them to form the opinion which they expressed, they stated their opinion to be that they did not regard her as capable of transacting any kind of business. This examination covered a period of from thirty to forty minutes, or possibly an hour, as one of the doctors said, and they also expressed the opinion that neither appellee nor her husband was simulating a lack of intelligence. They expressed the opinion that appellee would be unable to remember incidents that had happened several years back, and that they did not think she had mentality to recollect or recount incidents that had occurred fifteen or sixteen years previously. Upon their cross-examination, however, the questions asked and answers given by appellee when her deposition was taken were read to these doctors, and they stated that those answers were more connected and coherent than anything which they had been able to obtain, and they also expressed the opinion that the answers given indicated intelligence and continuity of thought, and that the answers indicated an understanding of the matters testified about and were fairly intelligent, except the phraseology employed in expressing them, but that this, however, was common in the case of illiterate persons like appellee and could not be regarded as a special mark of weakness of mind. And after the remainder of the questions and answers had been read the doctors testified that the answers indicated a fair degree of intelligence and that if they had been without any personal knowledge of the party interrogated, they would be of the opinion that the answers showed something near an average degree of intelligence, and that those answers lead them to believe that the wit-

ness had more capacity and intelligence and understanding of the subjects about which she was questioned than their examination of her would have led them to believe.

But possibly the more important of this evidence is that of appellee herself. She was examined and cross-examined at length, and was recalled for further examination and cross-examination. Notwithstanding the great length of time which had elapsed since the execution of her deed she appeared to remember the circumstances under which it was executed, although other witnesses to the transaction contradicted her statement that the deed which she signed was destroyed and another deed was prepared but was not signed by her. She had never up to then traveled on a train, but yet she followed her husband to Texas, and although she got lost there, this appears to have resulted from the failure of the brakeman to advise her of the proper place to change cars. She named the various places in Texas where she stopped and through which she passed and the length of time she remained in each and where and when she finally joined her husband. She went with him to Tennessee and detailed with fair intelligence their principal business transactions in that State. She described a piece of land which he purchased there and the terms of his contract for its purchase and the source from which he derived the funds to pay for the place. She remembered accurately and stated correctly the principal provisions of her father's will and knew the property which had been given to her and the conditions which had been imposed, and seemed to understand the nature and extent of her interests in that estate. She appears to have discussed frequently with her neighbors the sale of this land and to have advised with some, and to have been advised by others about her chances of recovering it long before this suit was brought. She told one person that she did bring this suit because she was afraid she might not recover the land, but she and her husband appeared to have bided their time and seized the first opportunity of taking possession of the land, thereby mak-

ing themselves defendants in a suit to determine its title. Upon her cross-examination, appellee showed her ability to count money, to spell her given name, and to give a rational answer to all questions that were asked about herself, her family, and her property.

In the case of *McEvoy* v. *Tucker*, 115 Ark. 430, we had occasion to consider the sufficiency of proof to establish the lack of mental capacity to invalidate a conveyance of real estate. In that case we quoted the rule applicable to such questions as stated by Mr. Justice Riddick in the case of *Seawel* v. *Dirst*, 70 Ark. 166, as follows:

"It follows, therefore, that the proof which is designed to invalidate a man's deed or contract on the ground of insanity must show inability to exercise a reasonable judgment in regard to the matter involved in the conveyance. * * * To have that effect, (*i. e.,* to invalidate the deed), the insanity must be such as to disqualify him from intelligently comprehending and acting upon the business affairs out of which the conveyance grew, and to prevent him from understanding the nature and consequences of his act."

In applying that test to the facts in this case, as we understand them to be, we have reached a conclusion contrary to the one announced in the case of *McEvoy* v. *Tucker*. We think that appellee was not a person of average intelligence, but this is not required. The ignorant and illiterate person may acquire property and may convey it, provided he knows what he is doing and understands and appreciates the transaction in which he is engaging, and we think appellee had this knowledge, and we are constrained to believe that she realized that her husband's trouble put her to a choice between her land and her husband, and she chose to sell her land to save him. And having made this election with intelligence enough to know that she had done so, she can not now recover her land, and the decree of the chancellor will be reversed and the cause remanded with directions to enter a decree in accordance with this opinion.