LUTHER *v.* BONNER.

4-6651                                        159 S. W. 2d 454

Opinion delivered February 23, 1942.

*John C. Ashley* and *Shouse & Shouse,* for appellant.

*Virgil D. Willis,* for appellee.

HUMPHREYS, J.    S. J. Hutcheson died on the 8th day of September, 1940, testate, bequeathing in his last will all of his property of every kind, share and share alike, to Fannie Luther, Jack Bonner and V. E. Hutcheson, nominating therein Jack Bonner as executor without

bond. V. E. Hutcheson was his son, Jack Bonner was a nephew, and Fannie Luther was a sister of S. J. Hutcheson's wife. Fannie Luther went to live with her sister and her husband when she was 10 years of age. She went into the home as a member of the family. Jack Bonner was taken into the home when he was about 16 months old. Mrs. Hutcheson died in 1925. After the death of Mrs. Hutcheson, Fannie Luther cared for Jack Bonner and V. E. Hutcheson during their babyhood and childhood. They all lived together as one family harmoniously and loved each other. Although Fannie Luther was 10 or 12 years older than V. E. Hutcheson and Jack Bonner, they regarded each other as brothers and sister. Fannie Luther was in a sense a mother as well as a sister to them. Both V. E. Hutcheson and Jack Bonner married. V. E. Hutcheson became a dentist and was located for a while at Eureka Springs and later at Mountain Home and spent very little time in the home of his father after he was married. Jack Bonner lived at Norfork, very near the Hutcheson home, with his family. After Mrs. Hutcheson died, Mr. Hutcheson's health began to fail and in 1933 he retired from the active management of his large business and allowed Jack Bonner to attend to most of the details connected with it, and Fannie Luther kept house for him and assisted him and Jack Bonner in looking after the properties he owned. Fannie Luther continued to drive S. J. Hutcheson over his farms and wherever his business carried him. Mr. Hutcheson depended to a large extent on Jack Bonner to look after all business matters, but assisted him along with Fannie Luther in doing so. In assisting Jack Bonner, Fannie Luther helped operate a store owned by Mr. Hutcheson and signed many checks and papers for him and for Jack Bonner, generally under the direction of Jack Bonner. At the time of the death of S. J. Hutcheson he was the owner of about 4,000 acres of farm land, a store in Norfork, a home in Norfork, and about 11 other houses and lots. He owned and operated a store, restaurant, a boat line in Norfork, and a cotton gin at Mountain Home. He also owned a large amount of personal property, perhaps 250 head of cattle, 27 head of mules and bank stock of

the face value of $1,000, which paid about $100 per year dividends. In addition, he had carried since 1930 an insurance policy for $10,000, in which Fannie Luther, Jack Bonner and V. E. Hutcheson were equal beneficiaries. This policy was in full force and effect at the time of his death. It was generally understood that he was carrying the policy in order to pay any and all indebtedness against his estate. He owed the bank and other creditors, and perhaps an overdraft at the bank, amounting in all to about $10,000.

A short time after the death of S. J. Hutcheson, Jack Bonner presented his will to the probate court and made proof thereof in regular form and on the first day of October, 1940, a judgment or order was entered in the court admitting the will to probate as the last will of S. J. Hutcheson, deceased, and the petitioner, Jack Bonner, was appointed administrator of the estate, and, after qualifying as such, received letters testamentary and entered upon his duties by taking possession of all the property of the estate, including the store, gin, restaurant, boatline, livestock consisting of several hundred head of cattle, mules, bank stock, and other chattels, and all the farms and real property of every kind. He never filed a complete inventory, in fact filed none, but left with the clerk a partial one which was never marked filed.

Soon after probating the will and assuming his duties as administrator, he made necessary proof of the death of S. J. Hutcheson and collected the $10,000 insurance policy. This money was used by him in paying a note he and S. J. Hutcheson had signed to the bank for $1,000, one S. J. Hutcheson had signed to the bank for $6,000 and an overdraft to the bank which had been incurred in operating the business and several other notes, all amounting to about $10,000, without the claims being approved and allowed by the probate court. It seems that the three beneficiaries in the insurance policy understood that the policy had been taken out and carried by S. J. Hutcheson so that his debts might be paid in case of his death, but the policy had never been assigned to any of the creditors. After using the insurance money in this way, it left the entire estate free from debt or in-

cumbrance. Nothing further was done in the way of administering the estate in the probate court. Jack Bonner, however, continued to operate the store, gin, restaurant, boatline, and all the farms and rented the houses and continued the cattle, mule and hog business without rendering any account to Fannie Luther. The reason he has not done so is that on the 28th day of September, 1940, he and V. E. Hutcheson obtained a quitclaim deed from her to all of her undivided interest in all the real estate belonging to the estate of S. J. Hutcheson when he died for a recited consideration of $1.00, and on the 22nd day of October, 1940, they obtained a contract or bill of sale to her undivided one-third interest in all the personal property owned by S. J. Hutcheson, at the time of his death, as well as all the real estate he owned when he died for a recited consideration of $40 per month for the remainder of her life. She was 51 years old at the time.

On the 21st day of July, 1941, Fannie Luther brought suit in the chancery court of Baxter county against Jack Bonner and V. E. Hutcheson, and their respective wives, to set aside the quitclaim deed and contract or bill of sale on the ground that deception was practiced upon her in obtaining the instruments, representing to her that they were instruments executed by her to them to enable Jack Bonner to administer the estate without the necessity of procuring her signature many times during the course of administration, and so she would not have to appear in the federal court to defend a condemnation suit pending in said court to obtain a part of the lands and a suit pending in the state court to condemn a part of the lands for a right-of-way of a railroad company, as well as inadequacy of price.

Appellees filed an answer denying that they paid an inadequate price for her undivided interest in said estate or that they or either of them practiced any deception or fraud in obtaining the instruments.

The cause was submitted to the court upon the pleadings introduced by the respective parties responsive to the issues joined, resulting in a finding that no fraud or deception was practiced on appellant in procuring the

quitclaim deed or bill of sale or contract and that appellees paid or agreed to pay a fair or adequate price for her one-third interest in the lands and personal property in the estate of S. J. Hutcheson, deceased. Based upon this finding a decree was rendered dismissing her complaint for want of equity, from which she appealed to this court. The court also found that the insurance policy or proceeds therefrom were not included in the sale of appellant's interest in the assets of the estate, and treated the complaint as amended to conform to the facts, and rendered a decree in appellant's favor for one-third of the proceeds collected on the policy, or $3,333.33, from which finding and decree appellees have prosecuted a cross-appeal to this court.

A great number of witnesses were introduced and testified to the value of the property owned by S. J. Hutcheson when he died. Most of appellant's witnesses valued the estate at $75,000 to $100,000 and most of appellees' witnesses testified that the value thereof was from $25,000 to $30,000.

V. E. Hutcheson was at the home of S. J. Hutcheson when his father died and remained there for 10 days or two weeks after his death. He testified that immediately after his father's death he and appellant had a conversation on the end of the porch of the home in which she said to him that she was so ''torn up over Sid's death that she did not know what to do''; that she was not experienced in running the farm, that she did not know how to do so, and that she would like for him and Jack to pay her enough to live on and take all the property. Fannie Luther, appellant, testified that she never had such a conversation with V. E. Hutcheson. V. E. Hutcheson testified that he informed Jack Bonner of the conversation, and that he and Jack Bonner then figured on the value of the estate and figured that they could afford to give her $40 per month, and that he never had further conversation on the subject in any way. Jack Bonner testified that V. E. Hutcheson told him about the conversation, and that he later told appellant they would give her $40 per month during her life-time, and that she agreed to accept that amount for her interest in the estate.

On September 28, 1940, the quitclaim deed was executed by appellant, conveying all her rights in the real estate to appellees, V. E. Hutcheson and Jack Bonner. Relevant to the execution of the deed, Fannie Luther testified that Jack Bonner telephoned her that he had to go to Mountain Home to attend to some business and wanted her to stay in the store; that this was not unusual; that she went to the store before daylight and that Jack Bonner presented her with a paper, saying to her that it was a paper giving him authority to handle the estate so that she would not have to be signing different papers, and so that she would not have to attend court; that she was anxious to avoid the necessity of attending court and that he said to her that the paper he wanted her to sign would relieve her of that necessity; that she did not read the paper, but signed it believing that he had told her the truth about the contents thereof; that she loved Jack Bonner as her own younger brother and thought that he loved her; that at the time she signed the quitclaim deed she did not suspect that he would do her any wrong in any way.

Jack Bonner testified that she knew all about the quitclaim deed and knew that she was conveying all her rights in the land to V. E. Hutcheson and himself; that he took the deed to Mountain Home, after she had signed same, and got the clerk to telephone her and take her acknowledgment over the telephone.

Fannie Luther also testified that on the 22nd day of October, 1940, Jack Bonner brought to her home another paper and told her that it was necessary for her to sign same in order to enable him to handle the personal property to the best interests of all of them and to make it more convenient for him in the administration of the estate in the probate court; that he inquired of her as to how much she felt that she would need to live on; that she told him $40 per month and that he showed her something in the paper about that sum of money; that she understood he wanted to know how much she should draw from the estate for her regular expenses so that he could keep a correct record of what she drew out to use and charge same to her; that he also said to her that it

was the thing for her to do to sign the paper and that he would look after all of her property for her; that she signed same on account of the confidence she had in him and her belief that the paper contained what he told her it contained; that she did not read the paper.

Jack Bonner testified that he explained the contents of the paper to her and read same to her two or three times and informed her that she was signing away all her interest in the personal property. He also testified that the price he and V. E. Hutcheson agreed to pay her for her interest in all the property was a fair price for same.

Fannie Luther testified that she signed the checks which Jack Bonner collected for insurance and made no objection to his using the proceeds in the payment of the debts, but at the time she signed the check Jack Bonner told her that he was going to deposit $1,000 of the money in a trust fund for her and as he wound up the business in the probate court he would continue to deposit one-third of the cash derived from the estate in the trust fund and that she thought the $40 per month for her current expenses would be drawn out of the trust fund from time to time; that she continued to live in the home place and to receive $40 per month for eight or nine months, but she finally made some inquiries relative to the trust fund and that V. E. Hutcheson told her he did not know anything about it; that Jack Bonner was looking after all that; that when she talked to Jack Bonner about it he put her off by telling her that he was too busy to discuss the matter; that she finally became convinced that something was wrong, so she went to see John C. Ashley about it, remembering that S. J. Hutcheson had told her prior to his death that if the boys did not treat her right, and if she needed an attorney, to go to John C. Ashley at Melbourne; that she explained the matter to him as far as she understood it, but upon investigation he found that she had conveyed all her interest in the estate; that thereupon she brought this suit to set aside the quitclaim deed and the bill of sale or contract for fraud practiced upon her in obtaining the instruments.

After a careful reading of the testimony we are convinced that Fannie Luther conveyed her interest in the

estate of S. J. Hutcheson for an inadequate and perhaps a grossly inadequate consideration and that she did so believing the instruments were executed by her to assist Jack Bonner in the administration of the estate in the probate court and in order to prevent the necessity of her personally appearing in the condemnation suits pending in the federal and state courts, and that she signed the instruments under the belief and impression that such was their purpose. We further think that she was justified under the circumstances in not reading the papers carefully before she executed them on account of the relationship existing between them. The family relationship had been that, in effect, of brothers and sister, or it might be said of mother and sons. In addition to this there was a trust relationship existing between Jack Bonner and Fannie Luther on account of the appointment of Jack Bonner as administrator of the estate in which appellant had an undivided one-third interest under the provisions of the will the deceased had made. We further concluded that they paid her or agreed to pay her an inadequate or perhaps a grossly inadequate consideration for her undivided interest in said estate, since the property owned by S. J. Hutcheson at the time of his death was not of less value than $50,000 exclusive of the $10,000 insurance policy. The disparity between the value of her interest in said estate and the amount they agreed to pay her is great. Another potent circumstance is that they gave her no security whatever for the payment of $40 per month.

The general rule seems to be that a mere inadequacy of consideration is not sufficient to set aside deeds without accompanying acts of fraud or deception, but that such fact is admissible as evidence of fraud on the part of the grantee. The general rule of law applicable may be found in the latter part of § 3211 in Thompson on Real Property (Permanent edition), vol. 6. We quote from the latter part of that section, which is as follows: "Mere inadequacy of consideration, when there is no fraud, affords no ground for avoiding a deed. It is enough that there is an actual consideration which is legal and of some value. Inadequacy of consideration, unaccompanied

by mental incapacity, fraud, duress, or undue influence, will not ordinarily be ground for setting aside the deed at the suit of the grantor, unless such inadequacy is so great as to shock the conscience of the chancellor and to itself establish mental incapacity, fraud, duress, or undue influence. The mere lack of consideration will not justify setting aside a deed at the suit of the grantor, no rights of third parties intervening, but such fact is admissible as evidence of fraud on the part of the grantee.''

The general rule may be found stated in more detail in § 1163, vol. 2, of Minor on Real Property. We quote the entire section, which is as follows: ''Here the fraud is apparent from the intrinsic nature and subject of the bargain itself, being such as no man in his senses, and not under a delusion would make, on the one hand, and no honest and fair man would accept, on the other.

''Mere inadequacy of price, standing by itself and independent of other circumstances, is not sufficient to set aside a transaction. But inadequacy, accompanied by other circumstances (e. g., weakness of understanding in the grantor or grantee; fraud, imposition, mutual mistake, or standing in a relation of influence), may readily make out a case of fraud; and it is said that if the inadequacy be so gross and manifest that it cannot be stated to a man of common sense without shocking the conscience and confounding the judgment, it suffices of itself (in the absence of adequate explanation) to prove that a fraudulent advantage was taken, as it shows that the person did not understand the bargain he made, or that he was so oppressed that he was glad to make it, knowing its inadequacy.''

This deal was made with appellant by appellees when appellant was greatly distressed on account of the death of her brother-in-law with whom she had lived practically all her life. The family relationship as well as the relationship of trust existed between Jack Bonner and appellant. The contract was not made between appellant and appellees after a consultation between them as to the value of the estate, but was made without any consultation whatever growing out of a separate conver-

sation V. E. Hutcheson had with appellant, according to his testimony and absolutely denied by appellant. It seems that the result of the conversation was carried to Jack Bonner by V. E. Hutcheson and that Jack Bonner and V. E. Hutcheson figured out that they could afford to give her $40 per month as long as she lived for her very valuable interest in the estate, and that thereafter Jack Bonner agreed with her, according to his testimony, that $40 per month during her life was enough to pay for the property, but according to her evidence there was no such oral agreement between them. According to her evidence, the first she knew about the deed was when it was presented to her at the store before good daylight for signature and that it was explained to her that it was necessary for her to sign it in order to facilitate Jack Bonner in administering the estate, and that she took his word as to the contents of the instrument, and that the next she knew about it was a short time thereafter when Jack Bonner presented to her the bill of sale or contract which she did not read on account of her confidence in the statement he made to the effect that it was necessary for him to also have a bill of sale to the personal property in order to facilitate the administration of same in the probate court. We think that before obtaining a deed to her interest in all the property it should have been listed and values attached to it so that appellant could have realized the total value she was surrendering before accepting therefor $40 per month, unsecured, during her lifetime and, further, that she should have been made to understand thoroughly the contents of the instruments, all of which were circumstances tending to show fraud. According to our summary of the evidence, the court erred in refusing to cancel the instruments and the judgment refusing to do so and the cause is remanded with directions to cancel the instruments and for further proceedings not inconsistent with this opinion.

On cross-appeal, the judgment in appellant's favor for $3,333.33 must also be and is reversed as appellant fully realized that the proceeds of the insurance policy were used to pay all the indebtedness against the estate

and that she received the benefit from the application in clearing the estate of all indebtedness which would have had to be paid in the course of the administration out of the other assets of the estate.