BARNER *v.* HANDY.

4-7427 183 S. W. 2d 49

Opinion delivered October 30, 1944.

*Pat Mehaffy,* for appellant.

*Baucum Fulkerson* and *Rose, Loughborough, Dobyns & House,* for appellee.

GRIFFIN SMITH, Chief Justice. Nancy was the wife of Milton Barner. With Milton's death in 1943 his sister, Josephine Handy, and Nancy, each inherited an undivided half interest in Lot 21 near Sweet Home. The question is whether Chancery Court erred in holding that Josephine's quitclaim deed to Nancy was procured through fraud, allegation also being that the grantor was without mental capacity to contract.

In 1942 A. J. Hoffman was associated with Rodgers, Bruton, and Brown in prospecting for bauxite. They maintained offices in a church building adjoining the Barner lot.[1] Hoffman, who with his associates operated ten drilling rigs, was directed by Bruton to test the church acreage for water. It is claimed by Hoffman that at this time it was not suspected that the land was underlaid with bauxite. Permits had been procured to drill exploratory holes, but in some instances leases had not been taken.

Concluding it would be profitable to lease the Barner land, Hoffman discussed the matter with Nancy. She delivered to him the deed under which her husband acquired title; also an abstract. Hoffman was told that Milton Barner died intestate, and that Josephine was his sister. However, Nancy volunteered assurance that Josephine would not claim her inheritance, and was willing to sign any necessary papers.

In these circumstances Rodgers, Bruton, Brown, and Hoffman took a lease from Nancy May 27, 1943, covering all of Lot 21. It was not recorded. Recited consideration was one dollar "and mutual covenants and undertakings." Royalty payments of fifty cents per ton were reserved to the "lessors"—plural.

Hoffman says that after discovering Josephine's interest, an attorney was consulted, with the result that a

---

[1] Bruton, in response to the question, "What is your business?" replied, "Contracting and mining."

deed from Josephine to Nancy was prepared and placed in Josephine's hands. Hoffman testified that while this deed remained undelivered (and presumptively unsigned) he talked with Josephine at Nancy's home and informed her regarding the interest then sought to be procured. Josephine replied that Nancy had worked hard to earn the money used in paying for the property, and ". . . I don't feel that I should have any part of it."

Josephine later signed the deed and then or later received ten dollars advanced by Hoffman, and in turn charged by Hoffman to Nancy's account. Nancy was given an equal sum. Hoffman took Josephine to a notary public in Little Rock (none being available at Sweet Home) and the transaction was completed June 1, 1943.

It is conceded by Hoffman that when the deal with Nancy was consummated, he knew that valuable deposits of bauxite were available on Lot 21. So impressed were the prospectors that when Nancy demurred because she had nowhere to go, Hoffman and his associates agreed to advance $2,000 in cash for her use in building a home. Hoffman's expression concerning the bauxite was, "It looked very promising." At trial evidence was that royalty interests were worth $15,000.

In consequence of Josephine's suit to cancel her quitclaim deed, and for an accounting, (filed in the name of Magnolia Flowers as next friend) the Chancellor found that the plaintiff did not have capacity to comprehend the nature of her transactions with Hoffman and Nancy, and that undue influence had been exerted. There was also a recitation that no consideration was paid.

The decree is correct. Though Nancy may not have expressly misrepresented to Josephine essential facts connected with Hoffman's operations and with potential values, effect was to acquire a half interest in fifteen thousand dollars' worth of royalties for 1/750th of the admitted worth, exclusive of remainders. It is contrary to business and personal experiences for a competent

person to knowingly part with $7,500 for a present payment of ten dollars.

Hoffman testified that, as to the lease, it was of no consequence to him who bestowed the right to take ore. Perhaps not. But it *was* essential that the grantor have a right to convey; and without Josephine's concurrence there could be no completed deal. Hoffman's purpose in prompting Nancy to have Josephine quitclaim was not an impersonal gesture.

If the argument be that mere inadequacy of consideration—that is, insufficiency of consideration unaccompanied by any other circumstances—will not suffice to cancel a conveyance, equity's answer is that when the amount paid is incomparable to value—a disparity so great as to cause reasonable minds to believe that what is claimed as consideration did not attain the dignity of a token—then we must apply the rule stated in *Pledger* v. *Birkhead,* 156 Ark. 443, 245 S. W. 510, and approved in *Sims* v. *Sims,* 175 Ark. 1170, 1 S. W. 2d 56. It was there said, in effect, that while mental weakness short of incapacity to execute the instrument in question may render a person more susceptible in respect of fraudulent designs, and lessen resistance to influence, (though such weakness may not, alone, in a given case, be sufficient to avoid the contract) yet when the impairment is proven, and it is shown that unfairness, undue influence, great inadequacy of consideration (or any one of these things) operated on the subnormal mentality to produce inequitable results, then courts will give relief.

Appellants made substantial proof that Josephine was not incompetent. The notary public who took her acknowledgment did not observe any unusual conduct. Her conversation appeared to be that of a rational person. Hoffman was of the same view. He thought she understood his disclosure that bauxite had been found on the land, and that it might be valuable. There was not, from his standpoint, anything unnatural in Josephine's assertion that Nancy's money had paid for the property, and that she (Josephine) did not contend for an interest.

Other witnesses supported the general trend of testimony relating to rationality.

On the other hand there were witnesses—some white and some black—[2] who testified to facts showing weak-mindedness. It is true that Josephine went about doing the ordinary things a sixty-nine-year-old woman in her circumstances must do; such, for instance, as going to a neighboring store, visiting in the community, discussing trivial matters, etc. There was testimony that for several years she had not been able to work; that her only income was from the State Welfare Department, and that relatives contributed to her maintenance. She was spoken of as "absentminded and unreasonable." She would go to the store, make small purchases, then leave without taking them with her. She borrowed fifty cents from one friend and thought it had been advanced by another. She purchased a money order from the postmaster, took it home, misplaced it, then insisted it had not been delivered to her. It was found where the purchaser had put it—the act having been immediately forgotten. Josephine on more than one occasion got "lost" in the immediate neighborhood. When but four blocks from home she became confused and had to be told where she was and how to return to her daughter's residence.

Hoffman's testimony in explanation of why, how, and when the payment to Josephine was made included this statement: ". . . After the notary signed, Nancy wanted to drive down town to one of the stores. At that time she wanted to know if I would give her sister-in-law ten dollars. I gave her the ten dollars, and also gave Nancy ten dollars. Both payments were charged to Nancy's account."

If this is a full disclosure and the language be literally construed, there was no consideration for Josephine's deed. The alleged "consideration," according to Appellant Hoffman, was a "gift"—a gratuity conferred *after* the deed had been made, and without reference to its execution.

---

[2] Both Nancy and Josephine are Negroes.

This is an appeal where the oft-repeated judicial expression, "on the whole case," has pertinent application. The "whole case" consists of separate acts whereby an inexperienced, illiterate, enfeebled and wholly dependent Negro found herself penniless in the presence of plenty, and the circumstances are such as to show an absence of conscious volition, or understanding.

Nor do we think the Chancellor erred in refusing to hold that when Nancy's money partially paid for the premises purchased by her husband, a trust arose.

Affirmed.