SMITH *v.* SMITH.

4-7777                                          191 S. W. 2d 956

Opinion delivered January 7, 1946.

*Ras Priest,* for appellant.

*Judson N. Hout,* for appellee.

HOLT, J.   W. B. Smith died intestate January 16, 1944. At the time of his death, he was approximately 87 years of age, his eyesight was defective, his hearing impaired, and he was unable to write his name. He had been married a number of times and ten children, or their surviving children, survived him. One of the appellees, Notra Hudgens, was the youngest child and the only child of her mother. The other three appellees composed the next youngest set of children. The appellants were born of earlier marriages. W. B. Smith had owned 240 acres of farm land prior to his death, and appellees lived on this land. The youngest daughter, one of the appellees, lived with her father for about ten years after she was married and cared for him until his death.

February 18, 1942, about two years prior to his death, W. B. Smith executed two deeds to 160 acres of his land to appellees, Willie Smith and Steve Smith, 80 acres to each. The deed to appellee Willie Smith recited a consideration of $3,000 ''to him paid,'' and the deed to appellee Steve Smith $2,500 ''to him paid.'' April 2, 1942, W. B. Smith conveyed 40 acres to appellee, Cora Smith Lacy, for ''$5 and other good and valuable considerations'' and another 40 acres to Notra Lee Hudgens for ''$5 and other good and valuable considerations.''

November 18, 1944, appellants filed this suit and alleged that W. B. Smith, at the time he executed the four deeds, *supra,* was mentally incompetent and that the instruments were procured by the appellees through fraud and undue influence on their father. They asked that the deeds be declared void and canceled. In the alternative, they further alleged that the consideration of $5,500 recited in the deeds to Willie Smith and Steve Smith was never paid and prayed recovery of this amount from appellant, John L. Smith, administrator of W. B. Smith's estate, in the event the said deeds were held valid.

Appellees answered with a general denial. Upon a trial, the trial court found the evidence insufficient to warrant cancellation of the deeds and dismissed that part of the complaint. On the second branch of the case, the court found that the consideration for the deeds of W. B. Smith to Willie Smith and Steve Smith was $2,000, of which amount $800 had been paid and that the administrator should recover the balance due, $1,200. Appellants have appealed from both parts of the decree and appellees have cross-appealed from that part of the decree holding Willie and Steve Smith liable to the administrator for $1,200.

## I.

It is a well settled rule of law that a man may dispose of his property as he may desire, in the absence of a showing of lack of mental capacity, or of fraud or undue influence practiced upon him. Here, appellants earnestly contend that W. B. Smith was mentally incompetent and unduly influenced at the time the deeds in question were executed by him. The burden was on appellants. The mental capacity of a grantor to make a deed is presumed. This is purely a question of fact. In *Braswell* v. *Brandon,* 208 Ark. 174, 185 S. W. 2d 271, this court said: "Since the sanity and mental capacity of a grantor to make a deed is presumed, the burden is upon those who allege that he did not have sufficient mental capacity to make the deed." *Beaty* v. *Swift,* 123 Ark. 166, 184 S. W. 442.

We try the cause *de novo* here and unless we can say that the findings and decree of the trial court are

against the preponderance of the testimony, we must affirm. After a careful review of all the testimony, we have reached the conclusion that it supports the findings and decree on both branches of the case.

Appellee, Notra Smith Hudgens, testified that her father died almost two years after he executed the deeds in question and that she was present at their execution; that her father had a very good mind; that he would show them where to plant cotton, corn and other crops and would insist that his orders be followed; that he knew what he was doing when he signed the deeds and that she had never seen him when he did not look like he had as good a mind as anybody.

Jeff Smith, one of the appellants, testified that his father's health was bad and that his daughter waited on him like a baby. Upon being asked by appellants' attorney, "How about his mind?" witness said, "Well, now, friend, that is hard to say. I'm not going to say about his mind." He further testified that he did not know whether his father knew what he was doing when he went to the lawyer's office to execute the deeds in question.

Dr. S. Justus testified that he had known W. B. Smith for about 36 years and had been his family physician for the last 15 years. When being asked about his mental condition, the doctor said he was about like any other man in his dotage. "Q. Was there anything from your examination or observation of him that would lead you to believe that he was not a man of sound judgment? A. I do not recall anything. Q. Would you say, doctor, that in the spring of 1942, W. B. Smith would know what he was doing in connection with business transactions? A. That was two years prior to his death? Q. Yes. A. I wouldn't know anything to the contrary. Q. Well, is it your opinion as a physician and his physician would you say that he didn't know what he was doing or have knowledge of any transaction that he might make then? A. No, according to my observation he would know the things we were talking about and there wasn't anything wrong with his mental condition in that respect."

Mrs. Ida Luther testified: "Q. Well, in the spring of 1942, you wouldn't say that he didn't know what he was doing when he did anything, would you? A. Well, not exactly. But I don't believe my father was right or he wouldn't have had the deeds made like they were. Q. That is the only thing you are basing it on, his making the deeds? A. Well, that is one. And another one is he didn't know who I was until I came in and I told him." Leonard Luther, husband of Ida, testified: "Q. In the spring of 1942, would you tell this court here that W. B. Smith didn't know what he was doing? A. I don't think he realized all that he was doing enough to transact his business." John Smith (the administrator) testified: "Q. Do you think that in the spring of 1942 that your father, W. B. Smith, was not competent to transact business at all? A. I wouldn't say that he wasn't." He further testified: "He told me one time up there that he had sold the boys 80 acres of land apiece—that was about 1942, somewhere along there," and quoting from the testimony of Mrs. Betty Roberts: "Q. Well, in the spring of 1942, you wouldn't say that he didn't know what he was doing when he did anything, would you? . . . A. Well, not exactly. But I don't believe my father was right or he wouldn't have had the deeds made like they were. Q. That is the only thing you're basing it on, his making these deeds? A. Yes, sir."

There was evidence of lapse of memory on the part of W. B. Smith, that he entrusted his bank account to two of the appellees, permitting them to draw on it, to sign his name to checks, and that he was liberal and indulgent with them, but we fail to find any evidence of fraud or undue influence exerted on the part of any of the appellees, and we think the effect of all the testimony tends to show that he possessed sufficient intelligence to transact business and fully understand the consequence of his acts. As above indicated, he had the right to prefer some of his children over the others.

The principles of law applicable to facts such as we have here have been many times stated by this court. Assuming that the trust relationship existing between W. B. Smith and appellees placed the burden on appellees to

show that the deeds to them were the free and voluntary act of a competent person, nevertheless we hold that appellees have satisfied this burden.

In *Beaty* v. *Swift, supra,* this court held: (Head-note.) ''An ignorant and illiterate person may acquire property and may convey it, provided he knows what he is doing and appreciates and understands the transaction in which he is engaging, and although a grantor is very ignorant, and there is evidence tending to show mental incapacity to make a deed, such deed will be held valid, where the evidence shows that he knew what he was doing and the purpose thereof.''

In *Atwood* v. *Ballard,* 172 Ark. 176, 287 S. W. 1001, this court said: ''If the maker of a deed, will, or other instrument has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom, and upon what consideration, then he possesses sufficient mental capacity to execute such instrument. Sufficient mental ability to exercise a reasonable judgment concerning these matters in protecting his own interest in dealing with another is all the law requires. If a person has such mental capacity, then, in the absence of fraud, duress, or undue influence, mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him.''

## II.

On the second branch of the case, as already noted, we think the preponderance of the testimony supports the trial court's finding that the intended and real consideration in the two deeds to Steve and Willie Smith was $2,000, and that they are still due the estate a balance of $1,200.

In addition to the testimony of Steve and Willie Smith to the effect that $2,000 was to be the consideration, we attach much weight to the testimony of Mr. J. N. Hout, Sr., on this point. He was a disinterested witness and unrelated to any of the parties. He testified that he was the farm loan agent of the Metropolitan Life Insur-

ance Company, and that Willie and Steve Smith, together with their father, W. B. Smith, came to him the latter part of 1941 and inquired what amount of money they could borrow on the two 80-acre tracts of land in question here, which W. B. Smith deeded to them February 18, 1942, and (quoting from appellants' brief) "I told them it would be in the neighborhood of $2,500. They said that would hardly be what money they would need. Mr. W. B. Smith stated at that particular time that he was selling the land to the boys, Willie and Steve Smith, and that they owed him a balance of $2,000 on the farm and he asked me if I would draw some deeds for them. I told him, no, that I didn't want to, and referred them to my son, J. N. Hout, Jr., at Newport. But they did make an application that day for $2,600, specifying that they owed W. B. Smith $2,000. Q. Did W. B. Smith tell you that they owed him a balance of $2,000 on the land? A. He did."

The evidence further discloses that this loan for approximately $2,600 was procured and that Mr. Hout's son, an attorney, prepared the deeds here involved to Willie and Steve Smith from their father, W. B. Smith. When the proceeds were received from the insurance company, Steve and Willie Smith deposited $800 in their father's bank account in part payment on the $2,000. The testimony of Steve and Willie Smith that they paid the balance due of $1,200 to their father in cash is so unreasonable in the circumstances as to carry little, if any, force. They were unable to produce any evidence of this payment to their father and were uncertain as to the time or place. They could give no explanation of their failure to deposit this $1,200 at the same time they deposited the $800 and they made no attempt to explain just why it was necessary to turn over to their father this large sum of money.

Finding no error, the decree is affirmed on both direct and cross-appeal.

ROBINS and MILLWEE, JJ., dissent.