PETREE v. PETREE.

4-8110

201 S. W. 2d 1009

Opinion delivered May 5, 1947.

*Graham & Graham* and *Warner & Warner,* for appellant.

*Partain, Agee & Partain,* for appellee.

ED. F. McFADDIN, Justice. This appeal grows out of an unsuccessful effort to have equity set aside a contract and conveyance, on the claim that the plaintiff was suffering from senility, and was overreached and defrauded by the defendant.

Chester Petree died intestate, a resident of Alma, Crawford county, Arkansas, on May 28, 1942, survived by (1) his wife, Mrs. Hays Petree (defendant below and appellee here) ; (2) his mother, Mrs. Anna Petree (the original plaintiff) ; and (3) a brother, Felix Petree. Chester Petree owned real estate and personal property appraised in excess of $70,000. On June 22, 1942, Mrs. Anna Petree conveyed to Mrs. Hays Petree all of Mrs. Anna Petree's interest in the estate of Chester Petree, in consideration of Mrs. Hays Petree's agreement to support Mrs. Anna Petree as long as she should live. This contract will be discussed later.

Some time in October, 1945, Felix Petree (son of Mrs. Anna. Petree) learned of the contract made by his mother to Mrs. Hays Petree. He then persuaded his mother to file this suit against Mrs. Hays Petree on November·13, 1945. The complaint alleged: that plaintiff's interest in Chester Petree's estate exceeded $50,000; that on June 22, 1942, the plaintiff was 87 years of age, infirm and suffering from senility, and incapable of transacting any business; that Mrs. Hays Petree occupied a fiduciary relationship towards the plaintiff; that Mrs. Hays Petree was guilty of fraud practiced on Mrs. Anna Petree in obtaining the execution of the conveyance and the contract; that the consideration in the contract was grossly inadequate; and that the conveyance from Mrs. Anna Petree to Mrs. Hays Petree should be set aside. The prayer of the complaint was for relief in keeping with the allegations. The answer denied all material allegations of the complaint, affirmatively pleaded fair dealings be-

tween the parties, alleged that the conveyance and the contract were executed to carry out the wishes of Chester Petree, and pleaded laches and limitations.

With issues thus joined, the cause proceeded to trial on May 23, 1946. All the witnesses appeared in person before the chancellor except the plaintiff, Mrs. Anna Petree, who—because of age and infirmity—testified by deposition taken at her home in Clarksville on December 10, 1945. After the evidence was completed, the chancery court allowed both sides to file written briefs, and—in deciding the case—the chancellor rendered a written opinion, which is in the transcript, and which has proven helpful to this court. The chancery court denied the plaintiff's complaint for want of equity, and this appeal challenges the correctness of that decree. While the appeal was pending in this court, Mrs. Anna Petree departed this life intestate; and, by consent, the cause has been revived in the name of Felix Petree, sole heir, and J. J. Montgomery, special administrator, as the appellants. The appellee is Mrs. Hays Petree. For convenient identification, we will refer to the parties by real name, rather than by legal designation.

The rules of law applicable to a case such as this one are well settled by numerous decisions of this court:

(a) In *Hawkins* v. *Randolph,* 149 Ark. 124, 231 S. W. 556, Mr. Justice HART quoted from *Kelly's heirs* v. *McGuire,* 15 Ark. 555: " 'If a contract is freely and understandingly executed, by a party, with a full knowledge of his rights, and of the consequences of the act, it must stand. This court disclaims all jurisdiction to interfere on account of the improvidence or folly of an act done by a person of sound though impaired mind.' "

(b) In *Pledger* v. *Birkhead,* 156 Ark. 443, 246 S. W. 510, Mr. Justice WOOD said: "If the maker of a deed, will, or other instrument has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom, and upon what considera-

tion, then he possesses sufficient mental capacity to execute such instrument. Sufficient mental ability to exercise a reasonable judgment concerning these matters in protecting his own interest in dealing with another is all the law requires. If a person has such mental capacity, then, in the absence of fraud, duress, or undue influence, mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him. *McCulloch* v. *Campbell,* 49 Ark. 367, 55 S. W. 590; *Seawell* v. *Dirst,* 70 Ark. 166, 66 S. W. 1058; *Taylor* v. *McClintock,* 87 Ark. 243, 112 S. W. 405; *McEvoy* v. *Tucker,* 115 Ark. 430, 171 S. W. 888.''

(c) In *Cain* v. *Mitchell,* 179 Ark. 556, 17 S. W. 2d 282, Chief Justice HART said: ''Mental weakness, although not to the extent of incapacity to execute a deed, may 'render a person more susceptible of fraud, duress, or undue influence, and, when coupled with any of them, or even with unfairness, such as great inadequacy of consideration, may make a contract voidable, when neither such weakness nor any of these other things alone would do so.' *Pledger* v. *Birkhead,* 156 Ark. 443, 246 S. W. 510, and cases cited; and *West* v. *Whittle,* 84 Ark. 490, 106 S. W. 955. See, also, *Phillips* v. *Phillips,* 173 Ark. 1, 291 S. W. 802; *Campbell* v. *Lux,* 146 Ark. 397, 225 S. W. 653.''

(d) In *Young* v. *Barde,* 194 Ark. 416, 108 S. W. 2d 495, Mr. Justice BUTLER quoted Mr. Justice EAKIN's words in the case of *Gillespie* v. *Holland,* 40 Ark. 28, 48 Am. Rep. 1, as follows: '' ' . . . it has been the well-established doctrine in equity that contracts, and most especially gifts, will be scrutinized with the most jealous care, when made between parties who occupy such a confidential relation as to make it the duty of the person benefited by the contract or bounty to guard and protect the interest of the other and to give such advice as would promote those interests. And this is not confined to cases where there is a legal control, . . . They are supposed to arise wherever there is a relation of dependence or confidence; especially that most unquestioning of all confidences which springs from affection on one side,

and a trust in a reciprocal affection on the other. The cases for the application of the doctrine cannot be scheduled. They pervade all social and domestic life. . . .' "

As heretofore stated, the rules of law as announced in the above cases are well settled, as all parties to this appeal agree. The difficulty arises when we measure the evidence in this case by these rules in order to determine on which side of the line this case falls—that is, whether Mrs. Anna Petree was (a) mentally infirm and, in fact, overreached, or (b) entirely mentally competent and free from undue influence or any other species of fraud. Appellants claim the former—*i. e.*, mental incapacity— and that the facts in the case at bar are similar to the facts in the cases of: *Cain* v. *Mitchell*, 179 Ark. 556, 17 S. W. 2d 282; *Morton* v. *Davis*, 105 Ark. 44, 150 S. W. 117; *Hawkins* v. *Randolph*, 149 Ark. 124, 231 S. W. 556; *Barnett* v. *Morris*, 207 Ark. 761, 182 S. W. 2d 765; *Barner* v. *Handy*, 207 Ark. 833, 183 S. W. 2d 49; *Campbell* v. *Lux*, 146 Ark. 397, 225 S. W. 653; *Luther* v. *Bonner*, 203 Ark. 848, 159 S. W. 2d 454; and *Young* v. *Barde*, 194 Ark. 416, 108 S. W. 2d 495. Appellee claims the latter—*i. e.*, full mental competency—and cites these cases: *Pledger* v. *Birkhead*, 156 Ark. 443, 246 S. W. 510; *Pernot* v. *King*, 194 Ark. 896, 110 S. W. 2d 539; *Smith* v. *Smith*, 209 Ark. 546, 191 S. W. 2d 956; *Atwood* v. *Ballard*, 172 Ark. 176, 287 S. W. 1001; *Rogers* v. *Cunningham*, 119 Ark. 466, 178 S. W. 413; *Cullins* v. *Webb*, 208 Ark. 631, 187 S. W. 2d 173; *McKindley* v. *Humphrey*, 204 Ark. 333, 161 S. W. 2d 962; *Johnson* v. *Foster*, 201 Ark. 518, 146 S. W. 2d 681; *Hawkins* v. *Gray*, 128 Ark. 143, 193 S. W. 509.

We reach the conclusion that Mrs. Anna Petree, though of ripe years, was, nevertheless, in full possession of all her faculties and entirely capable of transacting any and all matters of business when she executed the contract and conveyance on June 22, 1942, and that no fraud or overreaching was practiced on her. This conclusion necessitates that the decree of the chancery court should be affirmed; and, now, we discuss the evidence impelling such conclusion:

Chester Petree's home was in Alma. He died May 28, 1942. In June, 1942, Mrs. Hays Petree went to Clarksville to visit Mrs. Anna Petree; and at the conclusion of the visit Mrs. Anna Petree accompanied Mrs. Hays Petree to the latter's home in Alma, and remained there for about a week. It was during this week in Alma that they entered into the contract previously mentioned; and they were influenced largely by a letter signed by Chester Petree in August, 1941. We mention that letter:

In August, 1941, Chester Petree and his wife were contemplating an extended automobile trip; and before leaving Alma they signed a letter to Mr. and Mrs. Crenshaw, brother and sister-in-law of Mrs. Hays Petree. This letter was in the handwriting of Mrs. Hays Petree, and was signed by her and her husband. It was testamentary in character, but failed as a will, insofar as Chester Petree was concerned, because (1) it was not witnessed as required by § 14512, Pope's Digest; and (2) because the signature is the only part of the letter in the handwriting of Chester Petree, and thus the letter was not his holographic will under § 14512, Pope's Digest. The letter contained extensive references to the property accumulated by Mr. and Mrs. Chester Petree. It said in part:

"Alma, Arkansas, August 3, 1941

"To Mamie and Mr. Crenshaw:

"If it should happen that neither of us return from our trip or at any time we should both die, it is our desire that you please see that these instructions are carried out as to the distribution of our property. Of course, if one of us is left everything is to go to that one.

"Chester wants his mother to live in our home furnished as it is, as long as she lives if she would like to. If she would rather live at Clarksville, then the house is to go to the Methodist Church, here, for a parsonage. If she wishes to live in it—at her death it is to be given to the church to be used as a parsonage. Our interest in the canning factory amounts to fifty thousand dollars. Be-

sides this we have eleven thousand dollars in money in bank, due from factory on note, which is being used by the factory, and drawing interest. We have the stock in Mulberry store and seventeen or eighteen hundred dollars in bank there to credit of store. The Alma Cash Store stock and building belong to us and some money in bank to credit of that store. The home, and there is five thousand dollars life insurance made to me (Hays). We would like for Mrs. Petree (Chester's mother) to have twenty thousand dollars in money. First, to use as she needs it and at her death, after all expenses are paid, if there is anything left it is to go to a fund for the church to keep the house (parsonage) in repair.''

The entire estate of Mr. and Mrs. Chester Petree had been accumulated through their joint efforts. When they were married in 1913, he was the railroad agent at Alma (receiving a monthly salary of $75), and she was a music teacher. Without worldly goods they started life together. Through their joint industry and effort they accumulated this estate; and during all the intervening years they had provided for Mrs. Anna Petree. This letter to Mr. and Mrs. Crenshaw stated that if either of them (Chester or Hays Petree) should survive, the entire estate would go to such survivor; and, then, based on the assumption that Chester and Hays Petree should perish in a common disaster, they made provision for Mrs. Anna Petree.

So much for the contents of the letter. In June, 1942, when Mrs. Anna Petree was visiting Mrs. Hays Petree at Alma, Mrs. Hays Petree gave this letter to Mrs. Anna Petree to read. It was a full disclosure of the extent and value of the Chester Petree estate. It cannot successfully be said that Mrs. Hays Petree concealed the extent of the estate. Based on this letter, Mrs. Hays Petree and Mrs. Anna Petree entered into the written contract here attacked, by the terms of which Mrs. Anna Petree conveyed to Mrs. Hays Petree all of the former's interest in the estate of Chester Petree; and, in return, Mrs. Hays Pe-

tree agreed to support Mrs. Anna Petree just as Chester and Hays Petree had done for the preceding 29 years. The contract provided, in part:

"The party of the second part, Hays Petree, upon her part agrees and binds herself to continue to provide for the support and maintenance of the party of the first part, Anna Elizabeth Petree, throughout the remainder of her natural life in a style and manner fully equal to that in which she has been provided for by her husband and herself during the past few years, and further agrees to and does hereby bind her estate, heirs, executors and administrators to continue such maintenance, support and provision in like manner throughout the life of the said party of the first part, Anna Elizabeth Petree, in the event the said party of the second part should precede her in death, and her heirs, executors, administrators and assigns are specifically directed and instructed to see that the provisions of this contract in that respect are fully carried out and that such maintenance and provision for care of the party of the first part be made a prior claim upon her estate and any and all property and moneys with which she may die seized and possessed.

.  .  .  .  .

"It is further agreed and understood that payments to the party of the first part, Anna Elizabeth Petree, by party of the second part, Hays Petree, of sums for support and maintenance shall be made in the same manner in which they have customarily been made during the past few years preceding the death of the said Chester Petree, and that in the event of any dispute as to the amount required for such maintenance and support of the said party of the first part, then the highest amount contributed during any one year of the last five years shall be deemed controlling and the amount to be paid and contributed during any given year.

"As a further consideration for this contract, it is also agreed that in the event she may at any time desire during her life, the party of the first part, Anna Eliza-

beth Petree, may live in and make her home in the home of the party of the second part, Hays Petree, but that in the event she desires to make her home at Clarksville or elsewhere, then contributions to her maintenance and support will be made as herein set out."

For years, Mrs. Anna Petree had been furnished with a checkbook and had drawn a check of $5 per week regularly, and checks for other amounts as she desired. These other checks had been few in number, and small in amount, but she had the right to draw them as she desired. This checkbook arrangement continued, after the execution of this contract, without any change or interruption; and each week from June, 1942, until November, 1945, Mrs. Anna Petree wrote and cashed a check, signing the same, "Mrs. W. C. Petree account, by Mrs. A. E. Petree." These checks were not written by someone else and signed by Mrs. Anna Petree; the entire check was filled in by her, date, payee, amount and full signature as above.

The contract of June 22, 1942, was signed and acknowledged by Mrs. Anna Petree. Did she freely and understandingly execute the contract with full knowledge of her rights and of the consequences of her acts, and without compulsion or undue influence of any kind being exerted on her? We answer this question in the affirmative. In addition to the testimony of Mrs. Hays Petree, the record discloses the following:

(1) The notary public who took the acknowledgment to the instrument testified that he had known Mrs. Anna Petree for some time, that he talked with her about other matters as well as the acknowledgment, and that she talked in the usual normal manner, and said she had read the contract and thoroughly understood it.

(2) Three days after the execution of the contract, Mrs. Anna Petree went to Fort Smith to consult an optometrist, Dr. William H. Hunt, about her eyes. He testified that she was extremely alert mentally. He said:

"Q. You talked to her at that time? A. Yes, sir. Q. Do you have any idea how long she was in your office, and how long you talked to her? A. I remember we visited quite a little while. I have an idea, 30 or 40 minutes, or longer; 15 or 20 minutes testing; and I remember we discussed current events and floods on the Arkansas River. Q. What did you observe about her physical appearance and her mental attitude in talking with her? A. I made a notation on my record, 'Physical condition good for her age,' and she was very alert mentally—'very alert mentally.' In fact, we discussed current events and the floods on the Arkansas River, and I found out she knew lots more about it than I did, and I had been reading the newspapers and listening to the radio every day."

(3) One week after the execution of the contract, Mrs. Anna Petree returned to her home in Clarksville. Mrs. Hattie Petree (divorced wife of Felix Petree) lived with Mrs. Anna Petree; and, immediately upon the latter's return from Alma, Mrs. Hattie Petree interrogated Mrs. Anna Petree as to the estate of Chester Petree. Here is Mrs. Hattie Petree's testimony:

"I said, 'Well, what did you get?' And she (Mrs. Anna Petree) said: 'I get a living.' That is the way she said it—said 'I get a living out of it.' That is all she told me."

(4) Other disinterested witnesses testified that they observed Mrs. Anna Petree on June 22, 1942, and that she was entirely competent to transact business.

As against all this, the appellants offered evidence which we now mention:

(a) The deposition of Mrs. Anna Petree taken in December, 1945, in which she said she did not read the papers before she signed them, and did not know what the papers contained. But we point out that, even in that deposition Mrs. Anna Petree disavowed any desire to sue Mrs. Hays Petree in this case. Mrs. Anna Petree further said:

"Q. At the time you wrote these letters, or at any time, you didn't know that this complaint had been filed up in the court against her? A. No, sir. Q. In which you claimed that at the time Chester died and when this statement was signed, that you were feeble and weak and infirm, and incapable of transacting business and that she falsely told you that Chester didn't leave anything much, and things like that? A. Why, no. I never heard of anything like that. Q. And you never told anybody anything of that kind, either, did you? A. No, sir. Q. At any time? A. No, sir."

(b) The testimony of Dr. Hunt was offered by the appellants in an effort to show that Mrs. Anna Petree was not capable of transacting business on June 22, 1942. But we point out that Dr. Hunt first examined Mrs. Anna Petree in September or October of 1942, and stated that he then found her suffering from senility and deterioration of mental faculties caused by arteriosclerosis. Dr. Hunt said that this condition had not come on suddenly; but he never gave it as his opinion, that she did not have sufficient mental capacity on June 22, 1942, to enter into the contract here involved. He did say (to copy from appellant's abstract):

"People will become feeble and sometimes their mental faculties become weaker, but some people of advanced age hold high places and conduct business."

(c) There was offered testimony of Felix Petree and his divorced wife, Mrs. Hattie Petree, that Mrs. Anna Petree was not able to transact business in June, 1942.

The above is substantially the evidence; and of this evidence the learned chancellor said: "After studying carefully the testimony of the plaintiff as given by deposition and that of all other witnesses, who appeared in open court, the court is of the opinion that plaintiff, at the time she executed the contract and deed in question, was fully capable of understanding what she was doing, was able to perceive and know the extent and purpose of the entire transaction, and that it all met with her hearty

approval. There is no substantial testimony of any character that any fraud whatever was practiced upon the plaintiff.''

We cannot say that this finding of the chancellor is against the preponderance of the evidence; in fact, we think the evidence shows that the chancellor reached the correct decision; and we conclude that Mrs. Anna Petree, in executing the contract and conveyance, and in her dealings with Mrs. Hays Petree, was carrying out the wishes of Chester Petree as evidenced by the letter previously referred to. While the letter did not have sufficient legal formality to constitute a will, still Chester Petree's mother respected it as his wishes; and the contract and conveyance were of her own free will, and were executed at a time when Mrs. Anna Petree was in full possession of her mental faculties, and she was acting without any undue influence exerted on her by her daughter-in-law, or anyone else. Mrs. Hays Petree performed her part of the contract. From June, 1942, until after this suit was filed (and it was filed through the instigation of Felix Petree), Mrs. Anna Petree drew her checks regularly as heretofore noted, and by her letters and otherwise she expressed love and affection for Mrs. Hays Petree, and never did desire to have the contract rescinded.

Affirmed.

SMITH, J., dissents.